## McCARTY *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 319, September Term, 1971.]

*Decided May 10, 1972.*

424

*Motion for rehearing filed June 6, 1972; denied June 7, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Bernard J. Sachs,* with whom were *Francis J. Meagher* and *Goodman, Meagher & Enoch* on the brief, for appellant.

*Richard M. Hartman, Special Assistant City Solicitor,* and *Joseph S. Matricciani, Assistant City Solicitor,* with whom was *George L. Russell, Jr., City Solicitor,* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

The appellant (McCarty) was employed by the Mayor

and City Council of Baltimore (City) in 1948 as an inspector in the Bureau of Building Inspection. In 1959 he was promoted, he says, to the unofficial job of Building Code Enforcement Officer. In 1962 the City Council enacted Art. 11, Sec. 139 of the Baltimore City Code empowering and directing the Building Inspection Engineer to "designate an employee * * * as a Code Enforcement Officer." McCarty was so designated. On 1 July 1968 the Bureau of Building Inspection, including McCarty's position of Code Enforcement Officer, was transferred to the newly created Department of Housing and Community Development. On the same day Robert C. Embry, Esq., was appointed Commissioner of Housing and Community Development. Early in 1970 Embry, purporting to act for reasons of economy and efficiency, decided to "abolish" the position of Code Enforcement Officer. To adopt the City's euphemism, the position "was no longer funded as a budget item."

On 24 June 1970 McCarty filed in The Superior Court of Baltimore City a petition for the writ of mandamus, a declaratory judgment, an interlocutory injunction, a permanent injunction, $500,000 compensatory damages, $1,000,000 punitive damages and reasonable counsel fees. Named as defendants were the City, Embry, and the Board of Estimates.

We shall set forth the significant portions of McCarty's petition:

4. "* * * [on 8 June 1970 Embry advised him his position had] been abolished in the 1971 fiscal year budget * * * giving notice of termination of employment as Building Code Enforcement Officer * * * [as of 30 June 1970]."

7. "That there has been illegally created a new position known as Chief of Code Enforcement * * *."

8. "That * * * [defendants' actions] were not performed in good faith but as a subterfuge to get rid of * * * [him] * * *."

The appellees, after a few preliminary skirmishes, answered the petition in October 1970 but for reasons undisclosed the case did not come on for trial until 27 October 1971. Judge Harris presided, unaided by a jury.

Both parties seem to agree that the controlling principle of law is found in *Ball v. Board of Trustees of the State Colleges*, 251 Md. 685, 692 (1968). There Judge Finan said, for the Court:

> "Authorities universally affirm the proposition that the executive departments of government may lay off a merit system employee by abolishing the position which he holds, *with the limitation that it be for a bona fide reason and not a subterfuge to evade the merit system laws.* Stockton v. Department of Employment, 25 Cal. 2d 264, 153 P. 2d 741 (1944) ; Hooper v. Jones, 178 Md. 429, 434, 13 A. 2d 621 (1940) ; Slavin v. City of Detroit, 262 Mich. 173, 247 N. W. 145 (1933) ; Maxwell v. Board of Comm'rs of City of Wildwood, 111 N.J.L. 181, 168 Atl. 143 (1933) ; Smith v. City Commission of Flint, 258 Mich. 698, 242 N. W. 814 (1932) ; Owen v. City of Detroit, 259 Mich. 176, 242 N. W. 878 (1932)." (Emphasis added.)

Judge Finan also called attention to what Judge Delaplaine said for the Court in *Hopper v. Jones*, 178 Md. 429, 434 (1940):

> "* * * But, since the Legislature has failed to appropriate for the salary of the appellant, it is unnecessary in this case to determine the validity or the scope of the amendment. It has been repeatedly held that a Veterans' Preference Act can not circumscribe the right of municipal officials to abolish a position whenever they consider that such action is necessary for the public welfare, even though a veteran may be ousted thereby, *provided that there is no evi-*

*dence of bad faith or subterfuge to defeat the statutory preference. Maxwell v. City of Wildwood, 111 N.J.L. 181, 168 A. 143; Owen v. City of Detroit, 259 Mich. 176, 242 N. W. 878."* (Emphasis added.)

McCarty concedes, grudgingly to be sure, that he has the burden of proof and that his burden is onerous. We agree in both respects. *Potee v. County Comm'rs of Anne Arundel County,* 138 Md. 381 (1921). Judge Harris found that McCarty had "failed to sustain his burden of proof." We cannot say his finding was clearly erroneous. Maryland Rule 886.

One can infer from McCarty's testimony that he was something of a hotspur and, not surprisingly, a headache, at times, to his superiors in the department. In June 1967 Robert Deitrich, the Building Inspection Engineer, stated in a letter to McCarty that "[p]eriodically over the past several years I have found it necessary to admonish you regarding your relationships with both your fellow employees and the general public. In spite of these periodic admonitions there has been no appreciable change in your attitude or your conduct. * * * Since you have not seen fit to transfer to another department or resign, I therefore find it necessary to dismiss you * * *." McCarty thereupon asked for and obtained a hearing before the Civil Service Commission. The charge filed against him was that he had been "wantonly offensive in his conduct towards the public or towards other employees." The Commission thought "McCarty * * * [to be] a perfectionist, a person with little patience and a low flash point to his temper"; it found as a fact that he had "been curt and even abusive toward his fellow employees." Nonetheless the Commission ordered his reinstatement, conditional, however, upon his "demonstrating a more tolerant attitude, both to the public and his fellow employees." In January 1968 Deitrich "relieved [him] from duty for one week without pay * * *." When he returned the next week he was assigned "to other duties of substantially less importance and au-

thority * * *." Again the Commission ordered his reinstatement but the "one-week suspension" was allowed to stand.

After Embry assumed direction of the department Ross Sanderson, Deitrich's successor, told McCarty he was dissatisfied with his work and he urged him to transfer to another division. When McCarty refused Sanderson said (according to McCarty), "You are going to be sorry."

McCarty, although a member of the bar since 1955, "made no attempt whatever to find any work" from 30 June 1970 to 27 October 1971, the day of trial. He had been offered a job in the Division of Building Inspection in November 1970. His reason for refusing it was that he "didn't want to do anything at all to prejudice the outcome of this case." He said the reason he wanted to stay in the department was that he "was the only one honest enough * * * and conscientious enough * * * to handle that type of work."

McCarty's testimony, taken together with his documentary evidence, seems to us to fall short of proving either bad faith or subterfuge. He insists the implication is there but while one might infer bad faith or subterfuge one could quite as easily infer good faith and the absence of subterfuge. To shore up his case McCarty called Sanderson and Embry to testify in his behalf. While Sanderson may not have been a hostile witness he could hardly have been called friendly. Embry, however, was an adverse party whose testimony was neither rebutted nor contradicted, nor was it discredited. And McCarty, of course, was bound by it. *Nizer v. Phelps,* 252 Md. 185, 203-4-5 (1969) ; *Trusty v. Wooden,* 251 Md. 294, 297 (1968).

The following excerpts from Sanderson's testimony require little, if any, comment:

> "* * * he [McCarty] did not perform his work satisfactorily in terms of the job that we expected to be done."
>
> * * *

"* * * we felt that we couldn't expect that his performance would improve in this respect and that we did feel that perhaps he could work satisfactorily in another part of the agency, and I asked him to consider, seriously consider the possibility of moving to another assignment."

* * *

"* * * he said no, that it was a Civil Service job, it was his right to keep that assignment and that he would under no conditions give it up, and I said, would it be fair—now, I'm using my memory, that is a while back. I said, would it be fair to summarize his feelings about the matter in saying that he felt that he had an obligation on the part of the citizens of Baltimore to continue that job because he was the only one that was likely to continue in an honest and forthright manner and that anybody that might succeed him might not do it in such a fashion, and he said, yes, that would be a fair summary of why he insisted on staying on the job.

"Q. In other words, he felt a conscientious obligation to do an honest and straightforward job, is that what you mean? A. I think it could be interpreted that way, or it could be interpreted that he had a complex about the fact that only he could do that job in an honest manner and nobody else."

* * *

"However, during that time, we felt it necessary to put very strict limits upon Mr. McCarty's work because of certain aspects of the work he was unable to do adequately. I believe we did not permit him to appear in court in that period."

* * *

"Q. Didn't you want him out of your division? A. It wasn't a personal matter; I want to make

that clear. There was no personal emotion on my part about Mr. McCarty as an individual. Our personal relationships were satisfactory, but we had a job to get done and he wasn't, in the estimation of all of us, contributing to get that job done. So, there was no use maintaining that position."

\* \* \*

"Q. So, you were not motivated by a personal dislike of Mr. McCarty? A. No, I was not. I would say rather on the contrary. I found it very difficult, this situation, because the man had very fine qualities and personally, I had nothing personal—my personal relationships with him, I think, have been much more pleasant than my professional relationships. I hope it will continue that way."

\* \* \*

"Q. Well, the whole plan of reorganization was developed and brought about in order to remove Mr. McCarty, was it not? A. I don't think I would put it in those terms. No, as I have said before, that would have been the result of it, but that wasn't the purpose. It was to get more efficient enforcement procedure."

We have selected from Embry's testimony three excerpts which, taken together, are a fair summary of all he said.

"Q. Was it, then, your decision and your department's decision to abolish the position of Code Enforcement Officer to get rid of Mr. McCarty? A. No.

"Q. Then, what was the purpose? A. The purpose, as I stated, was twofold. One is that we have a continuing pressure on us to economize because of job freezes and budget shortages, that where we can dispense with a function or a person without inhibiting the efficiency of this department, we do so, and secondly, because

I was not satisfied with the machinery that we had set up to enforce the Housing Code and was intending to, either through the route of us hiring directly a prosecutor, which you say would have been forbidden by law, and which we have not pursued in any event, or through persuading the State's Attorney to assign someone full time, to have this function of preparing the cases and trying of cases centered in one person. That we have achieved."

\* \* \*

"Q. Was the objection to Mr. McCarty one of personality rather than competency? A. Well, the reason for terminating the job was not an objection to Mr. McCarty. If Mr. McCarty had been an outstanding employee, which we thought we couldn't lose, we wouldn't have abolished the job. Most jobs were not abolished, but the original impetus for that decision was that this was a gentleman we could afford to do without and it was a function that we could absorb and do more efficiently in another way."

\* \* \*

"Q. What came from the preparation of the budget for 1971, the one in which the Building Code Enforcement Officer was abolished; did you consider that a more effective means of getting rid of Mr. McCarty than going through the placement of charges? A. Our intention was not to get rid of Mr. McCarty. Our intention was to effect a savings in our budget and to have the function administered more efficiently and if that meant losing the services of Mr. McCarty, that was not a price we were unwilling to pay."

In the Baltimore Evening Sun of 13 June 1969 there appeared a piece by Edgar L. Jones, an editorial writer, bearing the title "Merit System vs. Merit," an excerpt from which follows:

"Hampered in his recruitment by the disinterest among young college graduates in submitting to a municipal examination, Mr. Embry is stuck meanwhile with a man in a highly important supervisory position who was twice suspended by previous administrators and twice reinstated by the Civil Service Commission. At the same time in the old Housing Authority section of his department, where civil service regulations never have applied, Mr. Embry finds that employees work harder and have higher morale, with no more evidence of politics than in the protected areas of employment."

McCarty says this is a clear indication of Embry's prejudice against him. Embry, however, denied that Jones was quoting him. He said he did not "recall using that language." He went on to say he did not believe, at the time, that he had "any opinion one way or the other as to Mr. McCarty's proficiency in his job or as to how that job might be better performed." Jones's refusal to reveal the source of his information was upheld by Judge Harris.

McCarty advances here an argument not made below, or so says the City. He insists the "office of the Building Code Enforcement Officer, having been created by [an] ordinance," cannot be abolished except by an ordinance. This argument has about it an air of plausibility which, unhappily, does not survive analysis. As we have said, it was not until the enactment of the 1962 ordinance, *supra,* that the designation "Code Enforcement Officer" was authorized. Sections (c) (1) and (c) (3) of the 1962 ordinance are as follows:

"(c) *Code Enforcement Officer; enforcement sections.* (1) For the purpose of enforcing strictly the provisions of the aforementioned Housing Hygiene Provisions and the Building Regulations, *the Building Inspection Engineer shall designate an employee of the Bureau of*

*Building Inspection as a Code Enforcement Officer,* and shall also establish within the Bureau of Building Inspection two enforcement sections which shall be staffed with such employees of the Bureau of Building Inspection as may be designated, from time to time, by the Building Inspection Engineer."

\* \* \*

"(3) The Code Enforcement Officer *shall perform such duties and services as may be assigned to him, from time to time, by the Building Inspection Engineer,* in connection with the enforcement of the said Housing Hygiene Provisions and the Building Regulations." (Emphases added.)

Since the record does not tell us precisely how McCarty came by the title of "Building Code Enforcement Officer" in 1959 it surely will not be unfair to assume that in 1962 his substantive rank was no more than "an employee in the Bureau of Building Inspection." As such he was designated as a "Code Enforcement Officer" to "perform [only] such duties and services as \* \* \* [might] be assigned to him, *from time to time,* by the Building Inspection Engineer [Deitrich]." (Emphasis added.) We cannot be persuaded that, having been so designated by Deitrich, McCarty could have been dislodged only by an ordinance. It seems to us that if Deitrich could designate him, Deitrich could withdraw his designation and designate some other "employee of the Bureau of Building Inspection." It does not appear that McCarty's salary would have been diminished had that actually occurred. This was the status he carried with him when his agency was transferred to Embry's department. Sanderson thereupon stepped into Deitrich's shoes and what Deitrich could have done Sanderson could now do. We think that Sanderson, in effect, did just that. McCarty was urged to accept a lateral transfer within the department but, as has been said, he refused.

His inflexibility or perhaps his messianic complex has proved to be his undoing.

We doubt that any useful purpose will be served if we allow ourselves to be drawn into quibbles over whether the "position" was in fact abolished, whether its elimination from the budget was proper, or whether it still exists, unfunded to be sure, but to rise Phoenix-like when funds may again be appropriated. For all practical purposes Embry's reorganization of the department has effected its metamorphosis. The position is now known as "Chief of Code Enforcement." Indeed, McCarty, having in mind, perhaps, the French cynicism, "Plus ça change, plus c'est la même chose," [1] takes a very dim view of it all, accusing Embry of merely giving the same job a new title. But he is a bit off course. Embry's reorganization of the department appears to have been real and substantial and there is nothing in this record to gainsay his claim of increased efficiency. The new job calls for a Civil Service rating of 42 as against a rating of 35 for the position held by McCarty, and the salary is somewhat higher, $15,858 versus $11,271.

*Judgment affirmed.*
*Costs to be paid by the appellant.*

---

1. For translation and source see *Heller v. Segner*, 260 Md. 393, 395 (1971), opinion by Hammond, C. J.