Joseph V. DIGIACINTO

v.

HARFORD COUNTY, MARYLAND, et al.

Linda L. O'NEILL

v.

HARFORD COUNTY, MARYLAND, et al.

Civil Nos. JFM–92–1880, JFM–92–2614.

United States District Court, D. Maryland.

March 31, 1993.

Victor Butanis, Bel Air, MD, for plaintiffs.

Jefferson L. Blomquist, Asst. County Atty., Harford County Dept. of Law, Bel Air, MD, for defendants.

## MEMORANDUM

MOTZ, District Judge.

These actions have been instituted by Joseph V. Digiacinto and Linda L. O'Neill against Harford County, Maryland and Randall J. Schultz, the Director of the Department of Human Resources of Harford County. Plaintiffs allege that their employment with the Department of Public Works ("DPW") of Harford County was wrongfully terminated, and they assert claims under 42 U.S.C. Section 1983 and under Maryland law.

Defendants have moved for summary judgment on the ground that plaintiffs were lawfully discharged as the result of a reorganization within the DPW.

## I.

### A.

In November 1990 the voters of Harford County elected Eileen Rehrmann to be the new County Executive. During the course of the campaign Rehrmann had heard complaints from developers and other members of the community that the DPW was inefficient and caused unnecessary delays in the issuance of permits and the negotiation of public works agreements. Shortly after the election, the incoming administration conducted a county-wide survey of County management level personnel. One of the conclusions drawn by the administration from the survey was that the DPW was "management heavy" and had spheres of overlapping responsibility which created internal conflicts.

In January 1991 Rehrmann dismissed Thomas F. Smith who had been serving as the director of the DPW. The new director who was appointed resigned shortly after taking office and was replaced by William Baker. Baker had formerly been the deputy director of the engineering division of the DPW. He was assigned the immediate task of restructuring the DPW to make it more efficient. Prior to the election Smith, the former director, had been developing a reorganization plan, and in carrying out his new task Baker reviewed the preliminary work which Smith had done.

The restructuring of the DPW culminated in the issuance of a Reorganization and Staffing Plan in March 1992. The number of divisions within the DPW was reduced from five to three. Although only four employees actually lost their jobs as a result of the reorganization, seventeen positions were eliminated. Thirty-two positions were transferred and twenty-four new positions were created. However, because of fiscal problems which the County is facing, twenty-two positions within the DPW are vacant.

### B.

Digiacinto and O'Neill were two of the employees who lost their jobs as a result of the reorganization. Digiacinto was the deputy director of the highways division, one of the divisions eliminated by the reorganization. Digiacinto had been hired by the County for the deputy director position in January 1989.

O'Neill had been employed by the County somewhat longer. She was originally hired in March 1983 as the executive staff director in charge of special products. In that position she was not within the County's classified service and served at will. In 1989, she did become a member of the classified service when her position was reclassified to "grants coordinator." In 1989, her position was again reclassified (still within the classified service) to management analyst. In both of the latter positions O'Neill reported to the County Executive.

In December 1990 Thomas Smith requested that O'Neill be transferred to the DPW. At first, she reported to him. However, in January 1991, she was reassigned within the DPW and began to work for the deputy director of the traffic and transportation division. Soon thereafter, the traffic and transportation division was abolished and its functions were merged into the highway division. At that point O'Neill and her supervisor were both moved to the environmental affairs division of the DPW. She was working there when she was dismissed.

## II.

Plaintiffs' Section 1983 claims are based upon the allegation that they were denied their procedural due process rights, particularly notice and the opportunity to be heard, before their employment was terminated. The circumstances under which each of the two plaintiffs learned of their pending dismissal differ markedly from one another. Digiacinto met on February 28, 1992 with Baker and defendant Schultz and for the first time was told that his position was being abolished effective March 2, 1992.[1] Upon

---

1. *Digiacinto was given severance pay by being*  *kept on the County's payroll for four weeks until*

hearing this he immediately left the meeting. He never filed a grievance with the County's Personnel Advisory Board ("PAB") before filing this action.

O'Neill was not immediately dismissed when the reorganization plan was adopted. On March 26, 1992 she and her attorney met with Schultz and Baker, and she was notified that her employment was to be terminated on July 1, 1992 when the administration contemplated that the classified position of management analyst (into which she alone fell) was to be abolished. In the latter part of April the PAB approved the deletion of the management analyst position from the pay and classification plan which was to be submitted to the County Council. O'Neill filed a grievance contesting this decision and on June 9, 1992, an evidentiary hearing (attended both by O'Neill and her counsel) was held before the PAB.

On June 29, 1992, while the PAB decision on O'Neill's grievance was *sub curia*, O'Neill (through her counsel, the former County Attorney) succeeded in persuading the County Council to restore the management analyst classification. However, the annual operating budget submitted by the administration to the County Council did not include any funding for O'Neill's position. Thus, when O'Neill reported to work on July 1, 1992 she was informed that she was no longer a County employee. On July 13, 1992, the PAB issued its decision denying O'Neill's grievance. O'Neill did not appeal this decision to the Circuit Court for Harford County as she was entitled to do under state law.

### III.

Defendants argue that although Digiacinto was given somewhat preemptory notice of the reorganization and his dismissal, he was fully aware (as a high-level manager with supervisory knowledge and experience) of his right to appeal his separation from County employment. Thus, according to defendants, his failure to pursue his appeal constitutes a waiver of his due process rights. *See, e.g., Downing v. Williams,* 624 F.2d 612, 630 (5th Cir.1980) (Ainsworth, J. dissenting), *adopted as majority opinion on reh'g* 645 F.2d 1226 (5th Cir.1981); *Barry v. Blue Springs R–IV School Dist.,* 557 F.Supp. 249, 256 (W.D.Mo. 1983). For her part, O'Neill argues that although she was given prior notice of her proposed dismissal and actually participated in grievance proceedings relating to it, she was not given adequate notice because the reason cited for her dismissal—the contemplated abolition of the management analyst classification—ultimately was countermanded by the County Council.

■ I need not decide the merits of either of these arguments.[2] The law is well established that "an employee who loses his or her job ... is not entitled to a hearing, despite the presence of a 'no dismissal except for cause' rule, when the position is abolished pursuant to a *bona fide* government reorganization or kindred cost-cutting measure." *Hartman v. City of Providence,* 636 F.Supp. 1395, 1410 (D.R.I.1986); *see also Duffy v. Sarault,* 892 F.2d 139, 147 (1st Cir.1989); *Misek v. City of Chicago,* 783 F.2d 98, 100–01 (7th Cir.1986); *Ryman v. Reichert,* 604 F.Supp. 467, 468–72 (S.D.Ohio 1985); *Mermelstein v. Haner,* 436 F.Supp. 238, 241

March 27, 1992. All of his employment benefits, including accumulated annual leave and personal leave, also accrued through March 27th.

**2.** I note, however, that O'Neill's argument appears unpersuasive. She was given ample notice of her dismissal and had a full opportunity to challenge it. Not only did she and her attorney fully participate in the grievance process available to her, they drew upon their political contacts to enlist a majority of the County Council in their efforts to save her job. If O'Neill desired to pursue her technical argument that it eventually turned out (in light of the County Council's action) that she had been given the wrong reason for her dismissal, she could have done so in appealing to the Circuit Court for Harford Coun-

ty the PAB's final decision rendered on July 13, 1992.

I also note that the only claim which O'Neill has (or could) assert in this action is the one arising from her dismissal as the result of the March 1992 reorganization. She is not challenging her December 1991 transfer to the DPW or her subsequent transfers within the department. These transfers were fully litigated in the proceedings before the PAB (despite the fact that O'Neill had not filed any grievances in connection with them) and could have been judicially reviewed by the Circuit Court for Harford County if O'Neill had chosen to appeal the PAB's decision.

(W.D.Va.1977), *aff'd mem.*, 588 F.2d 1350 (4th Cir.1978).[3] The reason for this rule is quite simple: if an employee is losing her job not because of allegedly deficient performance but for extraneous reasons relating to fiscal and operational concerns, a hearing regarding the quality of the employee's performance would serve no useful purpose.

■ An exception to this rule applies where a plaintiff can establish that the reorganization was not carried out in good faith and was merely a subterfuge. *See Hartman*, 636 F.Supp. at 1417 n. 22 (quoting *Ryman*, 604 F.Supp. at 469 (citations omitted)).[4] Here, however, the evidence, when viewed most favorably to plaintiffs, is not sufficient to give rise to an inference that the March 1992 reorganization was a pretext for their own dismissals. Preliminary plans for a reorganization had been developed by Smith, the former director of the DPW, before the 1991 election. When the new County administration conducted a study after hearing from citizen groups that the DPW was inefficient, it concluded that the department was, in fact, top-heavy in management. The new director then adopted an extensive reorganization plan which resulted in the elimination of two of the DPW's five divisions and the transfer or elimination of numerous positions and the creation of others. Although only four DPW employees actually lost their jobs, a reorganization is not unlawful because it is humane. Frequently, reductions in force are implemented in such a way that efficiencies and cost savings are accomplished to the extent reasonably possible by abolishing unoccupied positions and not filling new vacancies as they occur rather than by firing large numbers of existing employees. That is precisely what happened here.[5]

## IV.

■ The state law claims which plaintiffs have asserted are for a violation of Article 24 of the Maryland Declaration of Rights, wrongful discharge and intentional infliction of emotional distress. The state constitutional claim is identical to the federal constitutional claim, *see Pitsenberger v. Pitsenberger*, 287 Md. 20, 27, 410 A.2d 1052, 1056 (1980), and therefore falls with it. The wrongful discharge claim is premised upon an alleged violation of the public policy against terminating classified employees without cause embodied in the County's personnel law. Since that public policy could have been vindicated by a personnel grievance litigated in accordance with Maryland law, it is not remediable by a wrongful discharge action. *See, e.g., Chappell v. Southern Maryland Hosp.*, 320 Md. 483, 578 A.2d 766 (1990); *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 561 A.2d 179 (1989). The intentional infliction of emotional distress claim is frivolous since plaintiffs have not presented any evidence to show that defendants' conduct is "extreme and outrageous" or that their "emotional distress" has been "severe" as required by Maryland law. *See, e.g. Harris v. Jones*, 281 Md. 560, 567, 380 A.2d 611, 614 (1977); *Batson v. Shiflett*, 325 Md. 684, 734–36, 602 A.2d 1191, 1216–17 (1992); *Pemberton v. Bethlehem Steel Corp.*,

---

**3.** Maryland courts have recognized the same principle. *See, e.g., Ball v. Board of Trustees of State Colleges*, 251 Md. 685, 692, 248 A.2d 650, 654 (1968); *McCarty v. Mayor and City Council of Baltimore*, 265 Md. 423, 425, 290 A.2d 521, 522 (1972).

**4.** Plaintiffs have filed motions to amend their complaints to allege that the March 1992 reorganization was a sham. Since the amended complaints do properly structure the legal issues, those motions will be granted.

**5.** Digiacinto has submitted the affidavits of several persons suggesting that County officials were anxious to dismiss him because of anti-union activities in which he had engaged, including harassing union members and exerting pressure upon them to resign their union membership.

According to him, these affidavits are sufficient to show that the officials were improperly motivated when they abolished his position and terminated his employment. I do not agree. The mere fact that an employee who loses his job as a result of a general reorganization may be able to show that his superiors had reason to be concerned about his performance does not establish that the reorganization is itself a sham. In order to meet his burden of proving pretext, the employee must establish that the macro factors identified by the employer justifying the reorganization are themselves pretextual. Otherwise, the paradoxical result would follow that a general reorganization could be challenged by anyone with a questionable work record (but not by a person whose record is beyond reproach).

66 Md.App. 133, 160–61, 502 A.2d 1101, 1115 (1986).

A separate order effecting the rulings made in this memorandum is being entered herewith.

## ORDER

For the reasons stated in the memorandum being entered herewith, it is this 31st day of March 1993

ORDERED

1. The motions for leave to file amended complaints filed by plaintiffs in both actions are granted;

2. The motions for summary judgment filed by defendants in both actions are granted; and

3. Judgment is entered in favor of defendants against plaintiff in each action.