694 A.2d 937

**MARYLAND CLASSIFIED EMPLOYEES
ASSOCIATION, INC. et al.**

**v.**

**STATE of Maryland et al.**

**No. 79, Sept. Term, 1996.**

Court of Appeals of Maryland.

June 9, 1997.

2

John F. Conwell (J. Edward Davis, on brief), Towson, for Appellant.

Catherine M. Shultz (J. Joseph Curran, Jr., Attorney General; Joseph B. Spillman, Baltimore; Kathyrn M. Rowe, Assistant Attorney General, Annapolis), all on brief, for Appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

WILNER, Judge.

The Maryland Classified Employees Association, Inc. (MCEA), Chapter 232 of that Association, and seven of the Association's individual members, appellants here, filed an action in the Circuit Court for Baltimore City against the State of Maryland, the State Department of Human Resources, and three agencies within that Department, seeking a declaratory judgment that Chapter 491 of the 1995 Maryland Laws was unconstitutional.

Appellants' attack was on the provisions of Chapter 491 that created a four-year pilot program for the "privatization" of certain child support enforcement services in Baltimore City and Queen Anne's County then being provided by the Department of Human Resources. Appellants contended (1) that the inclusion of those provisions into what was otherwise a "welfare reform" measure caused the bill to run afoul of the requirement in Article III, Section 29 of the Maryland Constitution that a law embrace but one subject, and (2) that, substantively, those provisions violated appellants' Federal and State rights to due process of law.

In a Memorandum Opinion and Order, the court rejected appellants' contentions and entered a declaratory judgment that the law did not violate Article III, Section 29 and did not deprive appellants of due process of law, under either the United States or Maryland Constitutions. We granted *certiorari* to consider appellants' appeal before any proceedings in the Court of Special Appeals and shall affirm the judgment of the circuit court.

## I. *INTRODUCTION*

One of the dominant issues of public policy facing both Congress and State legislatures in the past few years has been the fashioning of an appropriate response to popular demands

for "welfare reform"—calls for limiting entitlements to Government assistance, particularly under the Aid to Families with Dependent Children (AFDC) program, and requiring competent recipients of such assistance to look to the job market, rather than to the Government, for sustenance. Caught up in that debate have also been a variety of measures to increase the effectiveness of public and private child support collection efforts, to assure that non-custodial parents are identified and made to provide regular and appropriate support for their children.

Those issues have been at the forefront of political debate in Maryland as well. They dominated the 1994, 1995, and 1996 sessions of the General Assembly. In the 1994 session, Governor Schaefer sponsored House Bill 482, authorizing a comprehensive pilot program of AFDC reform in three subdivisions of the State, but then vetoed the bill because of certain amendments added by the Legislature. *See* 1994 Maryland Laws at 3865. In the 1995 session, 19 bills were introduced dealing, in one way or another, with public assistance programs, including four that were similar in nature to the vetoed House Bill 482, and 31 bills were introduced dealing with child or spousal support. We are most concerned here with two of those bills—Senate Bill 754, which was enacted as Chapter 491, and House Bill 1177, which was defeated by the Senate as a separate bill, but the provisions of which were then amended into Senate Bill 754.

The sequel to the 1995 legislative activity came in 1996, when the General Assembly abolished the "welfare reform" pilot program enacted by Chapter 491 in favor of a different approach but left intact, for the remaining three years of its life, the separate pilot project of "privatizing" State child support collection efforts in Baltimore City and Queen Anne's County, initially proposed in House Bill 1177 and then merged into Senate Bill 754. *See* 1996 Maryland Laws, ch. 351.

The thrust of appellants' "single subject" attack on Chapter 491 arises from the engrafting of House Bill 1177, following its defeat in the Senate, on to Senate Bill 754. They see the two

bills as involving very different subjects, thereby causing the consolidated bill to embrace more than one subject. Particularly egregious, in their view, was the manner in which the consolidation was accomplished.

## II. *RELEVANT LEGISLATIVE HISTORY*

Senate Bill 754 was introduced on February 13, 1995. Designed to establish a pilot program of "welfare reform" in three subdivisions—Baltimore City and Anne Arundel and Prince George's Counties—it followed closely the basic format of House Bill 482 from the 1994 session and was but one of several similar bills introduced into the 1995 session. *See also* Senate Bills 212 and 300 and House Bill 1 (1995).

The basis and thrust of Senate Bill 754 were described in a preamble to the bill, which declared, among other things, that

(1) for too many families, welfare had become a permanent way of life and that a system of continuous income maintenance not only destroys an individual's incentive to become self-sufficient but also leads to intergenerational dependency;

(2) the current welfare system did not reward work or efforts to seek and obtain a job but instead created an incentive to stay on welfare, that it created numerous disincentives for the maintenance of two-parent families, and that it largely ignored the role and responsibilities of the father; and

(3) one of the priorities of the State was to achieve a significant reduction in the number of citizens enrolled in the AFDC program and to transform a system that fosters dependence, low self-esteem, and irresponsible behavior into one that rewards work and fosters self-reliance, responsibility, and family stability.

To help achieve those goals, the bill required the Secretary of Human Resources to establish a pilot program in Baltimore City and in Anne Arundel and Prince George's Counties, under which the Department of Human Resources and recipients of AFDC who were not specifically exempted from the program would be required to sign an agreement imposing

certain mutual obligations. The details of the program were couched as eligibility requirements for AFDC assistance. In its initial form, the bill required AFDC recipients (1) to cooperate with their local child support enforcement office if the paternity of any of their children had not been established, (2) to participate in job search and life skills activities for one week, (3) to continue supervised job search activities for the ensuing 11 weeks, and (4) if that job search proved unsuccessful, to receive additional case management services, including a job skills assessment, job counseling, and job training. Recipients with children under three years of age would have been required to devote up to 20 hours a week to the training and work requirements; those with children over three years of age would have been required to devote up to 40 hours a week, both subject to the availability of adequate child care, which the recipient was obliged to take all reasonable steps to arrange.

Beyond the training and search provisions was an actual work requirement. The bill, as introduced, would have terminated AFDC payments after 18 months unless (1) the recipient could show good cause, in accordance with criteria set forth in the bill, for an extension, or (2) she or he fulfilled certain work requirements. The work requirement could be satisfied by working full time in either a subsidized or unsubsidized job, by doing community service interspersed with job search activities for a formulated number of hours a week, or by working at an unsubsidized job and performing community service for an aggregate of 30 hours a week. Non-compliance with these requirements would result first in temporary and then in permanent terminations of AFDC benefits.

Those features of the bill were limited to AFDC recipients in the pilot program which, as the bill initially read, was expected to include only 2,000 families—1,000 in Baltimore City and 500 each in Anne Arundel and Prince George's Counties. *See* February, 1995 Fiscal Note to Senate Bill 754 prepared by Department of Fiscal Services. Other features of the bill were Statewide in application and were not limited to the pilot program. Among those features were (1) the re-

quirement that AFDC recipients who were themselves minors, as a condition of eligibility, live with a parent, guardian, or other adult relative, or in an adult-supervised group living arrangement, and (2) a provision that made the parents of minor parents jointly and severally liable for the support of their grandchildren.

Senate Bill 754 was substantially amended in both the Senate Finance Committee and on the floor of the Senate. Most of the amendments dealt with the scope and conditions of the pilot program in the three subdivisions. One of the more significant amendments not keyed to the pilot program was added on the floor of the Senate on March 27, 1995. It required the Department of Human Resources to notify the Motor Vehicle Administration of persons who were obligated to pay child support to AFDC recipients and who were more than 60 days in arrears in their child support, and the Motor Vehicle Administration then, after notice and an opportunity for hearing, to suspend the driver's license of such persons. The amendment tracked the language of House Bill 248, which had passed the House of Delegates nine days earlier and was then sitting in the Senate Judicial Proceedings Committee. With its language added to Senate Bill 754, House Bill 248 died in the Senate committee. As amended, Senate Bill 754 passed the Senate on March 29 and was sent to the House of Delegates.

While Senate Bill 754 was wending its way through the Senate, House Bill 1177 was being considered in the House of Delegates. That bill, introduced on February 20, was referred to the Committee on Appropriations. The bill created a child support enforcement "privatization" pilot program within the Department of Human Resources and directed the Secretary of that Department (1) to designate Baltimore City and two counties as program areas, and (2) to adopt regulations requiring the transfer "of all aspects of child support enforcement" to one or more private contractors. The transfer was to include responsibility for locating absent parents, establishing paternities, establishing support orders, collecting and dis-

bursing support payments, reviewing and modifying support orders, and enforcing support obligations.

A hearing on House Bill 1177 took place in the House Appropriations Committee on March 13, 1995. A bill analysis prepared as part of a Fiscal Note by the Department of Fiscal Services revealed that there was no centralized effort at child support enforcement in the State. In 19 counties, public child support enforcement was handled by the local department of social services—a unit within the Department of Human Resources; in two counties it was handled jointly by the county government and the local department of social services; in one county it was handled solely by the county government; and in one county it was handled by the clerk of the circuit court. In Baltimore City, the operation was run from the State Child Support Enforcement Administration headquarters. Administrative costs for this effort were funded by the State and Federal governments in 21 subdivisions and by Federal and local funds in three others. *See* Fiscal Note on House Bill 1177 prepared by Department of Fiscal Services.

The Fiscal Note also revealed the comparatively low level of recovery and high administrative cost in Baltimore City. It showed that in FY 1994, the Child Support Enforcement Agency collected $50.6 million in child support in Baltimore City, which was only 11% of total child support obligations for the City, and it spent $11.1 million to collect that $50.6 million.[1] In that one year, approximately $420 million in child support obligations went uncollected in Baltimore City. The Committee was obviously distressed by this record. In its Floor Report on the bill, the Committee declared the rate of collection in Baltimore City "absolutely intolerable." The Committee was presumably aware that, under Maryland Code, Family Law Article, § 10–111, the Child Support Enforcement Administration had existing authority to enter into agree-

---

1. According to the Fiscal Note, in Prince George's County, where the collection effort was locally operated, the same level of $50.5 million was collected, but the administrative cost was only $7.2 million, as opposed to the $11.1 million for Baltimore City. Baltimore County spent $3.4 million to collect $30.8 million.

ments with public and private agencies with respect to establishing paternity, establishing liability for support, collecting support, and enforcing support orders. The Fiscal Note informed the Committee that, pursuant to that authority, the Department had recently been contracting out collection activities for cases in which there was a 60–day delinquency.

Substantial opposition, in the form of both testimony and letters, was offered from the State's Attorney for Baltimore City, from employees of the Department of Human Resources, from MCEA, and from members of the public. In response to some of that opposition, the bill was amended by the Committee in a number of respects. The program was limited to Baltimore City and *one* county; a contractor was required to offer employment, on terms deemed by the Secretary to be fair and equitable, to employees affected by the transfer and to retain employees accepting the offer for at least two years, subject to dismissal for cause, at a benefit level comparable to the contractor's other similarly situated employees; and the Secretary was required to select a "demonstration site" in which the Department's child support enforcement unit was to "compete against privatized jurisdictions in providing child support enforcement services."

One additional amendment added by the Committee, that did not seem to be in response to any recorded opposition, followed precisely the floor amendment made to Senate Bill 754: the provisions of House Bill 248, requiring suspension of the driver's licenses of persons in default of their child support obligations to AFDC recipients, were added on to House Bill 1177. To that extent, the two bills were then parallel. The Department of Fiscal Services estimated that, through that sanction, $25.6 million in delinquent child support could be collected in the first year, of which $13.6 million would be AFDC related. As the bill reached the House floor, therefore, with that last amendment, it dealt with more than just a pilot program of "privatizing" child support enforcement, but included as well the driver's license suspension sanction. In its Floor Report, the Appropriations Committee observed:

"As amended, the bill has three main purposes. First, the bill creates a pilot child support enforcement privatization program in Baltimore City and one other county. Second, the bill creates a demonstration program in one other county to serve as a public sector competition site to the two privatized jurisdictions. Third and lastly, the bill includes the provisions of House Bill 248 *to create one omnibus child support enforcement bill.*"

(Emphasis added.)

The broader scope of the bill effected by these amendments was also reflected in the title to the bill, the caption of which was amended from "Child Support Enforcement—Privatization Pilot Program" to simply "Child Support Enforcement."

The bill, as amended, passed the House of Delegates on March 23 and was referred to the Senate Judicial Proceedings Committee. By letter to the Chairman of that Committee, however, the President of the Senate suggested that, in light of the potential fiscal impact of the bill, the Committee might wish to consult with the Budget and Taxation Committee. He also noted that the Welfare Reform Subcommittee of the Senate Finance Committee had "considered this issue during its debate on welfare reform" and that "[i]n light of this legislation's potential impact on the delivery of social services in Maryland and the Finance Committee's interest in this matter," the Judicial Proceedings Committee might also wish to consult with the Finance Committee.

The Judicial Proceedings Committee held its hearing on April 5, 1995—just five days before the end of the 90-day session. As in the House, substantial opposition was offered by MCEA, this time joined by the American Federation of State, County, and Municipal Employees, by several State's Attorney's Offices, by the Attorney General, and by individual citizens who may or may not have been Department of Human Resources employees or connected with one of the labor organizations. Senator Hoffman, Chair of the Budget and Taxation Committee, though supporting "the concept of privatization," indicated that too little was known about the effect of

"privatizing" all aspects of child support enforcement in Baltimore City and therefore recommended a delay. On the other hand, evidence was received that a child support enforcement "privatization" program in the Tidewater area of Virginia had resulted in a saving of 25% in operational costs. The contractor in Virginia reported increased collections of 11% and 12% in two areas in which it operated, compared with only a 7% increase achieved by the public agencies.

The Judicial Proceedings Committee made two principal amendments to the bill. It limited the program to Baltimore City and Queen Anne's County, and it required that any State employee who was hired by a private contractor and who remained employed by the contractor when the pilot program was terminated could return to State service (1) at a grade and step comparable to that which the employee would have attained but for the pilot program and (2) without any diminution of benefits or seniority rights. With those amendments, it reported the bill favorably.

The amendments added by the Judicial Proceedings Committee were approved by the Senate on second reading of the bill, but, on April 8, by a vote of 24 to 23, the bill was defeated on third reading.

Although House Bill 1177 was dead, its provisions were not. Senate Bill 754, with the driver's license suspension feature taken from House Bill 248 added to it, had passed the Senate on March 29 and was then residing in the House Appropriations Committee. On April 8—the same day on which House Bill 1177 was defeated in the Senate—the Committee made a number of amendments to the bill and, as amended, reported it favorably. Some of the amendments related to the AFDC pilot project authorized for Baltimore City and Anne Arundel and Prince George's Counties. One substantial amendment, Statewide in application, added a controversial "family cap" provision that had been deleted from the 1994 bill (that deletion being one of the articulated reasons for the Governor's veto). Under that provision, subject to various conditions, an AFDC recipient would receive no increase in benefits

by reason of the birth of a child 10 months or more after (1) the initial application for benefits or, (2) for current recipients, the effective date of the Federal waiver required to implement the State law. Finally, and most significantly for purposes of this case, the Committee added on to the bill the child support enforcement "privatization" provisions that had been included in House Bill 1177.

On the evening of April 10—the final day for legislative action—the House approved the Appropriations Committee's amendments, adopted a number of additional floor amendments, and passed the bill on third reading with a vote of 120 in favor and 19 opposed. Because of the House amendments, the bill was returned to the Senate for concurrence. At 10:50 p.m., the Senate concurred in the House amendments and Senate Bill 754, as amended, passed the Senate by a vote of 46 to 1. On May 25, the enrolled bill was signed into law by the Governor as Chapter 491 of the 1995 Laws of Maryland.[2]

## III.  *DISCUSSION*

### A.  Article III, § 29

Article III, § 29 of the Maryland Constitution provides, in relevant part, that "every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." As is evident from its very language, this provision contains two distinct, though related, requirements. We are concerned here only with the first—that a law embrace but one subject. No claim has been made by appellants—nor could one legitimately be made—that the "subject" of Chapter 491 of which they complain is not adequately described in its title.

We explored the history and purpose of the single subject requirement most recently in *Porten Sullivan Corp. v. State,*

---

2.  On October 9, 1996, the Board of Public Works approved a contract transferring the child support enforcement functions in the two subdivisions to Lockheed Martin IMS.

318 Md. 387, 568 A.2d 1111 (1990), and *State v. Prince Georgians*, 329 Md. 68, 617 A.2d 586 (1993). The provision was added to our Constitution in 1851. Its purpose has been described in a number of cases, but perhaps the clearest expression came in *Parkinson v. The State*, 14 Md. 184, 193 (1859). Our predecessors there noted:

> "It cannot be doubted, that this restriction upon the Legislature, was designed to prevent an evil which had long prevailed in this State, as it had been done elsewhere; which was the practice of blending, in the same law, subjects not connected with each other, and often entirely different. This was not infrequently resorted to for the purpose of obtaining votes, in support of a measure, which could not have been carried without such a device. And in bills of a multifarious character, not inappropriately called *omnibus* bills, provisions were sometimes smuggled in and passed, in the hurry of business, toward the close of a session, which, if they had been presented singly would have been rejected."

*See also Allied American Co. v. Comm'r of Motor Vehicles*, 219 Md. 607, 614, 150 A.2d 421, 426 (1959), *Whiting–Turner Contract. Co. v. Coupard*, 304 Md. 340, 361, 499 A.2d 178, 189 (1985), and *Porten Sullivan Corp., supra*, 318 Md. at 402, 568 A.2d at 1118, summarizing the objective of the clause as "prevent[ing] the combination in one act of several and distinct incongruous subjects."

The directive is simple enough and does not need much interpretation. We have, traditionally, given it a liberal construction "so as not to interfere with or impede legislative action." *Whiting–Turner, supra*, 304 Md. at 361, 499 A.2d at 189 (quoting *Painter v. Mattfeldt*, 119 Md. 466, 473, 87 A. 413, 416 (1913)). Indeed, as the Court observed in *Porten Sullivan*, only twice, to that point, had this Court struck down a statute for a "single subject" violation, 318 Md. at 402, 568

A.2d at 1118;[3] *Porten Sullivan* was to be the third time and *Prince Georgians* was to be the fourth.

That liberal approach is intended to accommodate a significant range and degree of political compromise that necessarily attends the legislative process in a healthy, robust democracy. It has sufficient fluidity to accommodate, as well, the fact that many of the issues facing the General Assembly today are far more complex than those coming before it in earlier times and that the legislation needed to address the problems underlying those issues often must be multifaceted.[4] As we pointed out in *Porten Sullivan*, proper application of the "single subject" clause requires consideration of how closely connected and interdependent the several matters contained within an Act may be, and "notions of connection and interdependence may vary with the scope of the legislation involved." 318 Md. at 407, 568 A.2d at 1120.

---

**3.** The two cases referred to were *Scharf v. Tasker*, 73 Md. 378, 21 A. 56 (1891), and *Curtis v. Mactier*, 115 Md. 386, 80 A. 1066 (1911). A rereading of those cases indicates that, in neither instance was the Act in question invalidated solely because of a "single subject" violation but more, or at least equally, because the offending provision was not mentioned in the title. In *Scharf*, we noted that the challenged provision "has nothing at all to do with the object and purpose of the statute, *and is manifestly not described in the title.*" 73 Md. at 385, 21 A. at 57 (emphasis added). The Act in *Curtis*, providing for the incorporation of the town of Chevy Chase, was challenged and found invalid because a taxing provision was nowhere mentioned in the title. Having so concluded, we went on, in *dicta*, to observe that, even if the taxing provision had been included in the title, the Act would still have been invalid because of the "single subject" problem. 115 Md. at 394, 80 A. at 1069.

**4.** In his classic history of the General Assembly, Carl Everstine notes that the Legislature's predilection in 1851 was for private and local bills and that "[a]nother century was to elapse before the State made an appreciable advance in curtailing local legislation." CARL N. EVERSTINE, THE GENERAL ASSEMBLY OF MARYLAND 33 (1850–1920). *See also* at 275 and 511. The marked growth in the size, scope, and complexity of State government itself, along with the new areas over which it has asserted regulatory jurisdiction, are matters of common knowledge subject to judicial notice. Simplistic and single-focused approaches are not always possible, and indeed may well be wholly inappropriate, when dealing with some of the health, environmental, economic, and social problems facing modern society.

*Porten Sullivan* and *Prince Georgians* illustrate the kind of circumstance in which the "single subject" requirement is, in fact, violated. In *Porten Sullivan,* a bill was introduced to extend the life of a special transfer tax in Prince George's County that was shortly to expire. The bill had only that one, limited purpose. During the legislative process, however, there were engrafted on to the bill detailed provisions requiring disclosures and recusals on the part of members of the County Council who received goods or services from applicants for certain zoning or other land use changes. Those provisions, which we termed the "ethics" provisions, were challenged as violative of the "single subject" requirement of § 29, and we agreed that they were.

The "ethics" requirements, we held, were entirely distinct from the extension of the taxing authority; there was no nexus whatever between the two subjects. Nor could they fit with the tax extension under any broader common umbrella envisioned by the bill: they were unrelated to the raising of revenue for county operations and even to the general authority of the County Council or the overall structure of the county government. There was, in other words, no legitimate, articulable common denominator.

Similarly, in *Prince Georgians,* those same "ethics" requirements, expanded to apply to the County Executive, after being rejected twice when included in a separate bill, were added to a bill dealing with zoning and planning matters in Montgomery County. We concluded that the ethics requirements, limited to Prince George's County, had nothing whatever to do with zoning and planning in Montgomery County—that the two sets of provisions were "distinct and incongruous" and their marriage in one bill therefore constituted a violation of the "single subject" requirement of § 29.

The relevance of those two cases, other than for contrast, is in the analysis that we used, particularly in *Porten Sullivan.* Connection and interdependence can be on either a horizontal or vertical plane. Two matters can be regarded as a single subject, for purposes of § 29, either because of a

direct connection between them, horizontally, or because they each have a direct connection to a broader common subject to which the Act relates. *See Panitz v. Comptroller,* 247 Md. 501, 511–12, 232 A.2d 891, 896–97 (1967) (otherwise disparate appropriations in supplementary appropriations bill sustainable under § 29 as embracing but one subject—increased financial aid to local subdivisions); *see also Baltimore v. Reitz,* 50 Md. 574, 579 (1879): "If several sections of the law refer to and are *germane* to the same subject-matter, which is described in its title, it is considered as embracing but a single subject, and as satisfying the requirements of the Constitution in this respect."

In undertaking that kind of analysis, we first must determine the perimeters of the challenged elements. As is evident from Part II of this Opinion, the perimeters of both Senate Bill 754 and House Bill 1177 changed significantly, even before their ultimate merger, as they separately worked their way through the legislative process. As introduced, House Bill 1177 involved a single matter—a pilot program to contract out child support enforcement efforts in Baltimore City and in two counties to be designated by the Secretary of Human Resources. Before being engrafted on to Senate Bill 754, however, it was expanded to include as well the provisions lifted from House Bill 248, authorizing the suspension of driver's licenses of persons in arrears of child support, and was regarded, at least by the House Appropriations Committee, as an omnibus child support enforcement measure.

█ The first question thus arising is whether the pilot program of "privatization" had a sufficient connection with the driver's license provisions to be reasonably regarded as part of the single subject matter of child support enforcement. The evidence presented to the House and Senate Committees in the form of the Fiscal Notes prepared by the Department of Fiscal Services leaves little doubt as to the existence and strength of that connection. The House Appropriations Committee, and presumably the House of Delegates as well,

clearly was disturbed by the dismal record of collections in Baltimore City by the Child Support Enforcement Administration—a mere 11% collection rate achieved at an administrative cost nearly double that in other areas of the State. Evidence existed of actual increased collections by private contractors in Virginia and of estimated increased collections through the driver's license suspension sanction. Clearly, the objective of the bill, as it passed the House of Delegates and emerged from the Senate Judicial Proceedings Committee, was to increase child support collections, and, on this record, it is absurd to suggest that the pilot program of "privatization" was not germane to that objective.[5]

■ The question then is whether that objective, of improved child support enforcement, has a sufficient nexus with the balance of Senate Bill 754 to constitute part of the "single subject" of "welfare reform" and thus satisfy § 29. There can be little doubt as to that either.

The unmistakable objective of Senate Bill 754—as articulated in its preamble—was to break the cycle of dependency on Government assistance. The major thrust in that direction was to substitute earnings from employment for "welfare"—to provide job training for AFDC recipients and then to provide a powerful incentive for them to seek and accept appropriate employment. Even from its inception, however, the bill recognized the role of child support enforcement in detaching people from AFDC. One of the conditions imposed on recipients was to cooperate with their local child support enforcement agency. From the beginning, recipients with small children were either exempt altogether from the pilot job training and employment program or were required to devote only part time to it, and, as the bill went through the Senate

---

**5.** It is not our function to assess the merits of this approach, for that is peculiarly a legislative matter. We simply hold that, on the record before us, the General Assembly was not unreasonable in concluding that a pilot program of "privatization" was germane to the broader goal of improving child support enforcement.

and House, those exemptions were enlarged.[6] The Legislature understood that, for some recipients, the only practicable alternative to AFDC, at least for a time, was the regular receipt of court-ordered child support from the non-custodial parent.

The nexus between child support enforcement and weaning people off of AFDC has been well-established for many years. In 1975, Congress recognized that "[t]he problem of welfare in the United States is, to a considerable extent, a problem of non-support of children by their absent parents," observing that, of the 11 million persons then receiving AFDC assistance, "4 out of 5 are on the rolls because they have been deprived of the support of a parent who has absented himself from the home." Senate Report No. 93–1356, accompanying H.R. 17045, 1974 U.S.Code Cong. & Ad. News 8133, 8145. That finding, in part, led Congress to include in Pub.L. No. 93–647 (Social Services Amendments of 1974) provisions requiring the States to enforce child support obligations more aggressively on pain of losing Federal AFDC funding. The principal method chosen by Congress was to require AFDC recipients to assign their rights to child support to the State and to cooperate with the State in identifying and locating the absent parent. The State, with its infinitely greater resources, would then be expected to proceed to collect the child support.

The close connection between child support enforcement and AFDC has been confirmed both by Congress and by the Maryland General Assembly on a number of occasions in the ensuing years. By 1980 Maryland Laws, ch. 569, the General Assembly authorized the State Comptroller to withhold from State tax refunds amounts of past due child support owed by

---

6. In its initial version, the bill exempted recipients with children under six months of age; recipients with children under three years were required to participate up to 20 hours a week and those with children over three were required to devote up to 40 hours a week to the job assessment and search activities. As it was enacted, Senate Bill 754 provided that a recipient was not required to participate in the program if she or he was caring for a child three years of age or older.

the taxpayer, as certified by Bureau of Support Enforcement, but limited that authority to cases in which the person caring for the obligor's children was receiving AFDC and the State had an assignment of the recipient's right to the support. The Fiscal Note to that bill prepared by the Department of Fiscal Services estimated that there were nearly 31,000 employed obligors who would have income tax refunds withheld under those circumstances and that an additional $2.1 million in child support would be collected. In 1988, a similar approach was taken with respect to State lottery prizes; upon certification by the Child Support Enforcement Administration with respect to cases in which the State had accepted an assignment of child support, the State Lottery Agency was directed to withhold from lottery prizes due obligors the amount of any past due child support. *See* 1988 Maryland Laws, ch. 595.

In 1981, as part of the Omnibus Budget Reconciliation Act (Pub.L.97–35), Congress required the Internal Revenue Service, upon notice from a State that a taxpayer owes past-due child support that has been assigned to the State, to withhold that amount from any refund of Federal income taxes due the taxpayer, made child support assigned to a State non-dischargeable in bankruptcy, and provided for the interception of unemployment compensation benefits to discharge past-due child support obligations.

In 1984, through Pub.L. 98–378 (Child Support Enforcement Amendments of 1984), Congress (1) provided incentive aid to encourage States to develop new child support collection programs and to improve program cost effectiveness, and (2) required the States, among other things, to institute mandatory wage withholdings if support payments were one month in arrears, impose liens against real and personal property for overdue support, withhold State tax refunds from parents who are delinquent in support payments, establish expedited procedures for determining paternity and obtaining and enforcing support orders, and create child support guidelines. The General Assembly promptly responded with 1985 Maryland Laws, ch. 329, making child and spousal support orders an immediate and continuing lien on the obligor's earnings and

authorizing enforcement of that lien when the obligor becomes 30 days or more in arrears.

In 1988, Congress enacted the Family Support Act of 1988 (Pub.L.100–485), requiring the States to make their child support guidelines presumptively applicable in establishing child support orders and to institute a system of wage withholding liens for child support cases being enforced by the agency. The General Assembly established guidelines in 1989 and made them presumptive in 1990. *See* 1989 Maryland Laws, ch. 2; 1990 Maryland Laws, ch. 58.

In testimony before the (U.S.) Senate Committee on Governmental Affairs in July, 1994, Mary Jo Bane, Assistant Secretary of Health and Human Services, asserted that "[t]he child support aspect is absolutely crucial to achieving welfare reform," because it provides "a financial base for families so that they can get off and stay off welfare." *Child Support Enforcement: The Federal Role: Hearing Before the Subcomm. on Federal Services, Post Office, and Civil Service of the Senate Comm. on Governmental Affairs,* 103d Cong. 7–8 (1994). That same point was made to the Maryland General Assembly in its consideration of Senate Bill 754. A 1995 Report by the Advocates for Children and Youth pointed out that "[b]ecause unpaid support obligations are responsible for keeping so many children in poverty, child support enforcement must be addressed as a component of welfare reform." MARTHA H. SOMERVILLE, ADVOCATES FOR CHILDREN & YOUNG, PATHWAYS TO SELF-SUFFICIENCY: WELFARE REFORM MOVING MARYLAND FAMILIES OUT OF POVERTY 14 (1995). It is implicit from the letter of the Senate President suggesting that the Judicial Proceedings Committee, in its consideration of House Bill 1177, consult with the Finance Committee, whose Welfare Reform Subcommittee had considered the same issue, that the pilot "privatization" proposal was related to the broader matter of "welfare reform."

This evidence, which is merely illustrative and by no means exhaustive, demonstrates not just a close connection, but a true interdependence, between effective child support enforce-

ment and the goal of significantly reducing the number of people relying on AFDC. It is therefore clear beyond cavil that Senate Bill 754 *did* embrace but a single subject, of which the pilot program of "privatizing" child support enforcement in Baltimore City and Queen Anne's County was a legitimate part. There was no violation of Article III, § 29.

## B. Due Process

■ Appellants' second argument is based on the Due Process clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. Relying on the Supreme Court's decisions in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), appellants claim that their due process rights have been violated because they obtained a property interest in their employment and will "lose their jobs" under the pilot program.

The precise nature of the alleged due process violation is not altogether clear. Appellants urge, as an underlying principle, that they have a property interest in their continued employment by the State and that, as a result of the "privatization" program, they will lose certain State rights connected with that employment—the right to 90 days notice of impending layoff, what they call, but do not define, as "a sequence of layoffs," certain seniority rights, and the right to reinstatement based on their level of seniority. They complain that they will not be able to transfer to other State jobs, that they will be deprived of sick, personal, holiday, and annual leave time, that they will lose the opportunity to grieve wrongful management decisions, that they will no longer be entitled to due process hearings prior to disciplinary actions, and that they will be deprived of layoff and reinstatement rights and other significant benefits, none of which are described. The thrust of their argument seems to be based on some notion of substantive due process.

Neither *Roth* nor *Sindermann* nor any other Supreme Court case of which we are aware (*see also Cleveland Board of*

*Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)) gives a State employee a lifetime Constitutional right to continued State employment, protected by a theory of *substantive* due process. Nor have we ever found such a right under Article 24 of the Maryland Declaration of Rights. *Roth* and *Sindermann* merely hold that, when the attributes attendant to public employment under State law are such as to give the employee "a legitimate claim of entitlement" to the position, as under a tenure plan or where dismissal may only be for cause, a property interest in that employment is created, and the right to *procedural* due process ordinarily requires the opportunity of a pre-termination hearing.

Even that procedural right to a hearing, however, has been held inapplicable to legislatively mandated reorganizations or reductions in force not based on individual fault or "cause." *See Duffy v. Sarault,* 892 F.2d 139 (1st Cir.1989); *Smith v. Sorensen,* 748 F.2d 427 (8th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985); *American Federation of Government Employees v. OPM,* 821 F.2d 761 (D.C.Cir.1987); *Praprotnik v. City of St. Louis,* 798 F.2d 1168 (8th Cir.1986), *rev'd on other grounds,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Digiacinto v. Harford County,* 818 F.Supp. 903 (D.Md.1993); *Franks v. Magnolia Hosp.,* 888 F.Supp. 1310 (N.D.Miss.1995), *aff'd,* 77 F.3d 478 (5th Cir. 1996); *Mayfield v. Kelly,* 801 F.Supp. 795 (D.D.C.1992); *Hartman v. City of Providence,* 636 F.Supp. 1395 (D.R.I. 1986); *Brown v. State Merit Sys. of Personnel Admin.,* 245 Ga. 239, 264 S.E.2d 186 (1980). Judge Motz said it best in *Digiacinto, supra,* 818 F.Supp. at 905–06, quoting in part from *Hartman v. City of Providence, supra,* 636 F.Supp. at 1410:

"The law is well established that 'an employee who loses his or her job ... is not entitled to a hearing, despite the presence of a "no dismissal except for cause" rule, when the position is abolished pursuant to a *bona fide* government reorganization or kindred cost-cutting measure ....' [citations omitted] The reason for this rule is quite simple: if an employee is losing her job not because of allegedly deficient

performance but for extraneous reasons relating to fiscal and operational concerns, a hearing regarding the quality of the employee's performance would serve no useful purpose."

In this case, of course, appellants did, in fact, have notice of the threat to their jobs posed by the pending legislation. They had not one, but two, opportunities for a hearing—in the House Appropriations Committee and in the Senate Judicial Proceedings Committee—of which they availed themselves. Indeed, many of the concerns expressed in their brief were addressed by the Legislature through amendments to House Bill 1177 that were subsequently engrafted on to Senate Bill 754. We find no Federal or State due process violation.

JUDGMENT AFFIRMED;   COSTS TO BE PAID BY APPELLANTS.