*Myong Nam Kim, et al. v. Board of Liquor License Commissioners for Baltimore City*, No. 137, September Term 2021; *Miae Han, et al. v. Board of Liquor License Commissioners for Baltimore City*, No. 140, September Term 2021; *In the Matter of the Petition of Myong Nam Kim, Yong Doo Park, and Myongnam, Inc.*, No. 885, September Term 2021; *In the Matter of the Petition of Myong O. Friley, et al.*, No. 886, September Term 2021.  Opinion by Beachley, J.

**ONE SUBJECT CLAUSE—ARTICLE III, § 29 OF THE MARYLAND CONSTITUTION**

**EQUAL PROTECTION CLAUSE—FACIALLY NEUTRAL GOVERNMENT ACTION—STRICT SCRUTINY—EVIDENCE OF DISCRIMINATORY INTENT REQUIRED**

During the 2020 legislative session, the Maryland General Assembly enacted Chapter 389, a bill that affected liquor licenses in the 45th legislative district in two ways. First, the bill allowed Class B beer, wine, and liquor license holders in a certain area to exchange their licenses for Class B-D-7 licenses, provided that the license holder executed a memorandum of understanding with a local community association.  Second, the bill restricted the hours of operation for Class B-D-7 licenses in a completely separate area of the 45th legislative district.

Chapter 389 of the 2020 legislative session took effect on July 1, 2020.  Thereafter, three separate liquor establishments, each possessing a Class B-D-7 license, were cited for being open outside the hours authorized by Chapter 389.  The three establishments are: M&M Lounge, Q's Liquors and Tavern, and Cocky Lou's (hereinafter the "Licensees"). M&M Lounge was cited twice.

The Licensees challenged their citations before the Board of Liquor License Commissioners for Baltimore City (the "Board").  Specifically, the Licensees argued that Chapter 389 was unconstitutional for two reasons.  First, the Licensees argued that Chapter 389 violated Article III, § 29 of the Maryland Constitution, which requires that all laws enacted embrace but a "single subject."  Second, the Licensees argued that Chapter 389 violated equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Constitution, asserting that the law improperly targeted African Americans because the restriction of operating hours impacted a predominantly African American community.

In all four cases, the Board held that the law did not violate the single subject requirement.  Regarding the equal protection argument, the Board held that the Licensees failed to produce sufficient evidence to support their equal protection claim.

The Licensees sought judicial review in the Circuit Court for Baltimore City. The four cases were divided between two judges. One judge affirmed the Board in his two cases, and the Licensees appealed those decisions. The other judge affirmed the Board's decision regarding the single subject requirement, but reversed the Board on the basis of equal protection, and the Board appealed those two decisions. Because of the similarity of counsel, the issues, and the legal arguments presented, this Court consolidated the four appeals.

*Held*: Decision of the Board of Liquor License Commissioners affirmed in all four cases.

Chapter 389 does not violate the one subject requirement in Article III, § 29 of the Maryland Constitution. The portion of the law allowing an exchange of liquor licenses in one part of the district, and the other portion restricting the operating hours for certain licenses in another part of the district "refer to and are *germane* to the same subject matter"—the regulation of alcohol in the 45th legislative district. *Md. Classified Emps. Ass'n, Inc. v. State*, 346 Md. 1, 16 (1997) (quoting *Baltimore v. Reitz*, 50 Md. 574, 579 (1879)).

The Board did not err in declining to reach the equal protection claim. Where government action is facially neutral, and a challenger alleges that the action discriminates against a suspect class (such as race) and seeks strict scrutiny review, the challenger may not simply rely on evidence of a disparate impact to obtain strict scrutiny review. Rather, the challenger must produce evidence of discriminatory purpose or intent before the burden shifts to the government (pursuant to strict scrutiny) to defend its conduct.

Here, although the Licensees produced evidence showing a disparate racial impact based on the restriction on operating hours, they produced no evidence showing any discriminatory purpose on the part of the General Assembly. Accordingly, they failed to meet their evidentiary burden for establishing strict scrutiny review of Chapter 389, and the Board correctly declined to consider their argument.

Circuit Court for Baltimore City
Case Nos. 24-C-20-003794,
003795, 004827, 004828

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 137, 140, 885, and 886

September Term, 2021

———————————————————

MYONG NAM KIM, ET AL.
v.
BOARD OF LIQUOR LICENSE
COMMISSIONERS FOR BALTIMORE CITY

———————————————————

MIAE HAN, ET AL.
v.
BOARD OF LIQUOR LICENSE
COMMISSIONERS FOR BALTIMORE CITY
———————————————————

IN THE MATTER OF THE PETITION OF
MYONG NAM KIM, YONG DOO PARK,
AND MYONGNAM, INC.
———————————————————

IN THE MATTER OF THE PETITION OF
MYONG O. FRILEY, ET AL.
———————————————————

Kehoe,
Beachley,
Shaw,

JJ.

———————————————————

Opinion by Beachley, J.

———————————————————

Filed: June 29, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In July of 2020, the Board of Liquor License Commissioners for Baltimore City (the "Board") cited three separate liquor establishments (the "Licensees") for violating a newly enacted law which limited the hours of operation for certain liquor licenses in a boundary within the 45th legislative district.[1] One of the Licensees was cited twice, resulting in four total violations. The Licensees unsuccessfully challenged their citations before the Board by arguing that the new law was unconstitutional in two ways: the law violated the Maryland State Constitution's "one subject" requirement, and that the law violated equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland State Constitution. The Board rejected the Licensees' argument regarding the one subject requirement, and "decline[d] to rule" on the equal protection argument because the Licensees "failed to provide satisfactory record evidence" to support their claims. Subsequently, the Licensees filed petitions for judicial review in the Circuit Court for Baltimore City. The four petitions for judicial review went before two different Baltimore City Circuit Court Judges that resulted in different outcomes—one judge affirmed the Board's decision in two cases while the other judge reversed.

The judge who affirmed the Board determined that the new law did not violate the one subject requirement, and that the Licensees failed to provide sufficient evidence to support their equal protection claims. The judge who reversed the Board, however,

---

[1] The 45th legislative district is located in Baltimore City. Its wards, precincts, and blocks are described in Md. Code (1984, 2021 Repl. Vol.), § 2-202(45) of the State Government Article. We note that this statute was recently amended pursuant to Joint Resolution 1 of the 2022 legislative session. Those amendments, however, are immaterial to our decision.

determined that the Board erred in its equal protection analysis. The Licensees timely appealed from the judge who affirmed, and the Board timely appealed from the judge who reversed. While the cases were pending, this Court issued an Order consolidating all four appeals, noting that "[t]he petitioners in all four cases were represented by the same counsel and presented virtually the same legal arguments." Accordingly, the issues we must now decide in these consolidated appeals are:

1. Whether the newly enacted law violates the "one subject" clause of Article III, § 29 of the Maryland Constitution.

2. Whether the Board correctly rejected the Licensees' equal protection claim due to insufficient evidence.

As we shall explain, we conclude that the law does not violate the one subject clause. Additionally, we hold that the Licensees presented insufficient evidence to proceed with their equal protection claim. Accordingly, we affirm the Board's decision in all four cases.[2]

**<u>FACTS AND PROCEEDINGS</u>**

Because of the somewhat cumbersome nature of the underlying facts and proceedings, we shall proceed as follows. First, we explain the procedural history of Chapter 389 of the Maryland Laws of 2020—the law which went into effect on July 1, 2020. The Licensees concede that they violated this law, but argue that it is unconstitutional. Second, we explain the underlying facts and the procedural history that brought about the consolidated appeals.

---

[2] The judge who affirmed decided cases 24-C-20-003794 and 24-C-20-003795. The judge who reversed decided cases 24-C-20-004827 and 24-C-20-004828.

According to its website, the Board is authorized by law to issue several different types of liquor licenses within Baltimore City.  Liquor License Board, License Types https://llb.baltimorecity.gov/license-types (last accessed June 1, 2022).  In this case, we are concerned with Class B-D-7 beer, wine, and liquor licenses.  The Board issues Class B-D-7 liquor licenses to "taverns," and, subject to other restrictions, these establishments may generally operate seven days a week from 6:00 a.m. to 2:00 a.m.  *Id*.  All the Licensees in this case possess Class B-D-7 beer, wine, and liquor licenses.

On January 22, 2020, Senator Cory McCray, who represents Maryland's 45th legislative district, sponsored and introduced SB 571.  We refer to the Fiscal and Policy Note for SB 571, which accurately noted that the bill would

> alter[] the hours of sale for a Class B-D-7 beer, wine, and liquor license located in an area of Baltimore City bounded on the north by North Avenue, on the west by Central Avenue and Harford Avenue, on the south by Monument Street as it runs from North Central Avenue to North Wolfe Street and McElderry Street as it runs from North Wolfe Street to Luzerne Avenue, and on the east by Luzerne Avenue as it runs from Monument Street to Federal Street, then by Rose Street as it runs from Federal Street to North Avenue.  The hours of sale for a license holder in this area are from 9 a.m. to 10 p.m. and may not be extended if they begin later than 9 a.m. or end after 10 p.m.  **The bill takes effect July 1, 2020.**[3]

The purported goal of the bill was to reduce crime in the area.  *See* Cory V. McCray, *Vote Yes on Senate Bill SB: 571* (Feb. 28, 2020) (stating that a reduction in operating hours for certain liquor establishments will result in a reduction in violent crime).  The Baltimore

---

[3] As the Licensees correctly note in their Reply Brief, SB 571's restriction on hours of operation was not limited to Class B-D-7 licenses in the designated boundary.  Specifically, the restriction in hours within the boundary would apply to certain Class A and Class D liquor licenses.

City Senate Delegation "voted unanimously in favor of" the bill. The Senate, with minor amendments, voted to approve the bill, and on March 15, 2020, the Senate referred the bill to the House. Following a first reading, the bill was forwarded to the House Economic Matters Committee. Apparently, however, the Economic Matters Committee declined to hold a hearing on the bill, and the bill died.

While SB 571 was working its way through the Senate, on February 5, 2020, Delegates Stephanie Smith, Talmadge Branch, and Tony Bridges introduced HB 954, a bill which would also impact liquor sales in the 45th legislative district. HB 954, as originally written, applied to an area "bounded by the unit block of West Preston Street, the 1200 block of North Charles Street, the 1200 block of Morton Street, and the unit block of West Biddle Street[.]" In that bounded region, which we note is completely separate from the boundary described in SB 571, HB 954 would

> authoriz[e] a Class B beer, wine, and liquor license holder in a certain legislative district to exchange the license for a Class B-D-7 beer, wine, and liquor license if the licensed premises is in an area bounded by certain streets and an applicant executes a memorandum of understanding with a certain community association; providing that a certain license holder is authorized to provide outdoor table service, authorizing the [Board] to make issuance or renewal of a certain license conditional on the substantial compliance of applicants entered into a certain memorandum of understanding; and generally relating to alcoholic beverages in Baltimore City.

2020 Sess., House Bill 954, First Reading (available at https://mgaleg.maryland.gov/ 2020RS/bills/hb/hb0954f.pdf). Simply put, HB 954 as initially written would apply to a completely separate boundary within the 45th legislative district than SB 571, and would allow Class B liquor license holders to exchange their licenses for Class B-D-7 licenses,

4

provided that the license holders executed a memorandum of understanding with a local community association.

HB 954 passed unanimously in the House, and on March 15, 2020, following a first reading in the Senate, the bill was sent to the Senate's Education, Health and Environmental Affairs Committee. That Committee voted to report the bill as "favorable." While on the Senate floor, Senator McCray moved to amend the bill by adding to HB 954 the language from his previously sponsored SB 571 regarding the restriction of hours for liquor licenses contained within a separate defined boundary of the 45th legislative district. After the Senate approved the bill with Senator McCray's amendment, the House unanimously accepted the Senate amendment, resulting in the bill's passage. The new law was enacted on May 8, 2020, as Chapter 389 of the 2020 regular legislative session.

As enacted, Chapter 389 amended the Alcoholic Beverages Article as follows. First, it modified Md. Code (2016, 2020 Supp.), § 12-903 of the Alcoholic Beverages Article ("AB") by adding the following language:

> (F) In the 45th legislative district, a Class B beer, wine, and liquor license may be exchanged for a Class B-D-7 beer, wine, and liquor license if:
> (1) the licensed premises is in an area bounded by the unit block of West Preston Street, the 1200 block of North Charles Street, the 1200 block of Morton Street, and the unit block of West Biddle Street; and
> (2) the applicant executes a memorandum of understanding with the Mount Vernon-Belvedere Improvement Association.

Chapter 389 also modified AB § 12-905, a statute concerning Class B-D-7 liquor licenses, by adding the following language:

> The hours of sale are from 9 A.M. to 10 P.M. for a license holder in an area bounded on the north by North Avenue, on the west by Central Avenue and Harford Avenue, on the south by Monument Street as it runs from North

5

Central Avenue to North Wolfe Street and McElderry Street as it runs from North Wolfe Street to Luzerne Avenue, and on the east by Luzerne Avenue as it runs from Monument Street to Federal Street, then by Rose Street as it runs from Federal Street to North Avenue.

We note that several sections of the Alcoholic Beverages Article have been amended since the enactment of Chapter 389 of the 2020 legislative session. Nevertheless, the provision restricting the hours for Class B-D-7 liquor licenses within the defined boundary of the 45th legislative district remains unaltered. *See* AB § 12-2004(c)(4). With this legislative background in mind, we turn to the underlying facts and procedural history that brought about these appeals.

The Licensees in this case consist of the following liquor establishments: M&M Lounge, Q's Liquors and Tavern, and Cocky Lou's. All of the Licensees possess Class B-D-7 beer, wine, and liquor licenses. The Licensees do not contest that their liquor establishments are located within the boundary defined in Chapter 389 that restricted the hours of operation for B-D-7 liquor licenses. Nor do they contest that, in July 2020, each one of them was operating outside the hours authorized by Chapter 389.[4]

In response to their citations, the Licensees separately challenged the legality of Chapter 389 with the Board. In all cases, the Licensees proffered two arguments: that Chapter 389 violated the one subject requirement contained in Article III, § 29 of the Maryland Constitution, and that Chapter 389 violated the Fourteenth Amendment's Equal

---

[4] M&M Lounge was cited for being open on July 20, 2020, at 11:11 p.m., and again on July 29, 2020, for being open at 8:28 a.m. Q's Liquors and Tavern was cited for being open on July 10, 2020, at 10:50 p.m. Cocky Lou's was cited for being open on July 29, 2020, at 8:14 a.m.

6

Protection Clause (and, concomitantly, Article 24 of the Maryland Constitution). In all cases, the Board concluded that the legislation did not violate Article III, § 29 of the Maryland Constitution. Additionally, the Board concluded that the Licensees produced insufficient evidence to support their argument that Chapter 389 violated the Equal Protection Clause. The Licensees then filed petitions for judicial review in the Circuit Court for Baltimore City. As previously noted, the four cases were assigned to two judges: one who affirmed the Board, and one who reversed the Board. The judge who affirmed the Board rejected the Licensees' argument regarding the one subject requirement and agreed with the Board that the Licensees presented insufficient evidence to support their Equal Protection Clause argument. The judge who reversed the Board concluded that there was no one subject violation, but reversed the Board's decision concerning the Equal Protection Clause, finding that the Board applied the wrong legal standard. In all four instances, the losing party timely noted an appeal.

## STANDARD OF REVIEW

This Court has previously described the appropriate standard of review for a decision by a local liquor licensing board as follows: "In reviewing the decision of an administrative agency, this Court performs the same function as the circuit court. We review the decision of the agency, not that of the circuit court." *Dakrish, LLC v. Raich*, 209 Md. App. 119, 141 (2012) (citations omitted) (quoting *Bd. of License Comm'rs for Prince George's Cnty. v. Global Express Money Ords., Inc.*, 168 Md. App. 339, 344 (2006)). "Our role is limited to determining if there is 'substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the

7

administrative decision is premised upon an erroneous conclusion of law.'" *Id*. at 141-42 (quoting *Global Express Money Ords., Inc*., 168 Md. App. at 345). Although we review an agency's purely legal decisions *de novo*, *Patten v. Bd. of Liquor License Comm'rs for Balt. City*, 107 Md. App. 224, 230 (1995), we accord a degree of deference to an agency's decision involving the interpretation and application of a statute which that agency administers, *Bd. of Liquor License Comm'rs for Balt. City v. Kougl*, 451 Md. 507, 514 (2017).

Additionally, we note that, "Under settled Maryland law, appellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency." *Cap. Com. Props., Inc. v. Montgomery Cnty. Plan. Bd*., 158 Md. App. 88, 96 (2004) (citing *Mayor & City Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 582 n.3 (1998)).

## DISCUSSION

Our review of the Board's decision requires us to decide two issues: (1) whether the Board erred as a matter of law when it concluded that Chapter 389 did not violate the one subject clause of the Maryland Constitution[5]; and (2) whether the Board erred when it concluded that the Licensees failed to produce sufficient evidence to support their claim that Chapter 389 violated the Equal Protection Clause. We conclude that the Board did not err in either instance.

---

[5] The Licensees raised no challenge regarding the requirement in Article III, § 29 that every bill the General Assembly enacts must be "described in its title[.]"

8

I.    THE ONE SUBJECT CLAUSE

Article III, § 29 of the Maryland Constitution provides, in relevant part, that "every Law enacted by the General Assembly shall embrace but one subject." In their brief, the Licensees argue that "limiting the hours of operation of one area of Baltimore City and granting the ability to exchange a Class B license for a Class BD7 license in a separate discrete area are two different subjects[.]" They therefore assert that the provision limiting the hours of operation "should be stricken from the law as unconstitutionally violative of Article [III] § 29 of the Maryland Constitution: that every Law enacted by the General Assembly shall embrace but one subject." We reject the Licensees' argument and hold that Chapter 389 does not violate the "one subject" requirement of Article III, § 29 of the Maryland Constitution.

According to our research, the last time any Maryland appellate court expressly decided whether a law violated the one subject clause was in 2002 in *Delmarva Power & Light Co. v. Pub. Serv. Comm'n*, 371 Md. 356 (2002). The genesis of the one subject violation there arose from the issuance of a Court of Appeals opinion on April 8, 2002, the last day of the 2002 regular session of the General Assembly. In that opinion, the Court of Appeals held that a certain Public Service Commission ("PSC") regulation was invalid for failing to follow the regulation-making provisions of the Administrative Procedure Act. *Id*. at 359-62. The purpose of the regulation in question was to place "certain requirements on the electric and gas utilities that remained subject to regulation by the PSC and impose[] certain limitations on the relationships that those utilities had with their non-regulated affiliates." *Id*. at 359.

9

Earlier in the 2002 Regular Session, the House of Delegates introduced House Bill 135 which "had the very narrow purpose of creating a special, non-lapsing Public Service Commission and Office of People's Counsel Fund to fund the operations of the PSC and the Office of People's Counsel (OPC)." *Id*. at 362. The Senate, however, had been working on a similar bill during the legislative session, and referred its own version, SB 620, to the Senate Finance Committee. *Id*. at 363. Apparently, "the Senate bill had a number of features not included in the House Bill." *Id*.

> With amendments added by the Finance Committee, SB 620 passed the Senate on March 15—six days before the House of Delegates passed HB 135.
>
> Each House amended the other's bill to conform with its own version. The Senate amended HB 135 to conform with SB 620, and the House of Delegates amended SB 620 to conform with HB 135. Neither House was initially willing to accept the other's amendments, so, on April 4, 2002, both bills were referred to a Conference Committee consisting of three Senators and three Delegates. That was where they lay when, on the morning of April 8, [the Court of Appeals] opinion was filed.

*Id*.

The Conference Committee resolved the differences between HB 135 and SB 620 largely by accepting the Senate amendments to HB 135. *Id*. The Committee, however, upon learning of the Court of Appeals's opinion striking down the PSC's regulation, added additional language to HB 135 that retroactively excused the PSC from complying with the Administrative Procedure Act, effectively overturning the Court of Appeals's decision. *Id*. at 363-64. According to available legislative history materials, it appeared that the Conference Committee, in making its recommendations to the two Houses, failed to reveal that the bill now included a provision that retroactively excused the PSC from complying

10

with the Administrative Procedure Act. *Id*. at 365. In the late-night hours before the session officially ended, both the Senate and the House of Delegates passed HB 135, and the Governor signed the bill on May 16, 2002. *Id*. at 366.

The bill was subsequently challenged for violating the one subject clause. The Court of Appeals began its analysis by noting the rationale behind the adoption of Article III, § 29 of the Maryland Constitution. *Id*. at 368. The provision, though not a part of the original Maryland Constitution of 1776, was adopted in 1851. *Id*. Its purpose, however, was "obvious and highly commendable":

> It was intended . . . to deal with the practice of engrafting onto subjects of great public importance "foreign and often pernicious matters" of local or selfish purposes, thereby inducing legislators to vote for such provisions "which, if they were offered as independent subjects, would never have received their support," in order not to endanger the main objective.

*Id*. (quoting *Davis v. State*, 7 Md. 151, 160 (1854)). Indeed, the Court of Appeals has observed that

> foreign matter has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew any thing of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted.

*Id*. (quoting *Davis*, 7 Md. at 160). Thus, one rationale for the one subject provision is to prevent members of the legislature from either selfishly or surreptitiously inserting unnecessary provisions which, standing alone, would likely not receive sufficient support to pass.

11

The Court of Appeals has also noted another important rationale for the one subject

rule—"protect[ing] the integrity of the governor's veto power." *Porten Sullivan Corp. v.*

*State*, 318 Md. 387, 400 (1990) (quoting Robert F. Williams, *State Constitutional Limits*

*on Legislative Procedure: Legislative Compliance and Judicial Enforcement*, 48 U. Pitt.

L. Rev. 797, 809 (1987)).  The one subject rule prevents

> a practice under which the legislature could include in a single act matters
> important to the people and desired by the Governor and other matters
> opposed by the Governor or harmful to the welfare of the state, with the result
> that in order to obtain the constructive or desired matter the Governor had to
> accept the unwanted portion.  The veto power of the chief executive [would]
> thereby [be] severely limited if not destroyed and one of the intended checks
> on the authority of the legislature [would be] able to be negated in practice.

*Id*. (quoting *Brown v. Firestone*, 382 So.2d 654, 663-64 (Fla. 1980)).

Noting the appellate history of the one subject clause, the *Delmarva Power & Light*

Court stated:

> Although in the past century-and-a-half there have been more than
> 130 cases in this Court in which legislation has been challenged under that
> provision of the Constitution, until 1990, only twice had we found a violation
> of the "single subject" requirement, in part because the Governor and the
> General Assembly, over the years, have usually acted responsibly and in
> compliance with the requirements imposed by the Constitution, and also in
> part because of our general disposition "to give the section a liberal
> construction, so as not to interfere with or impede legislative action."

371 Md. at 368-69 (quoting *Whiting-Turner Cont. Co. v. Coupard*, 304 Md. 340, 361

(1985)).  The Court explained that this deferential approach

> is intended to accommodate not only a "significant range and degree of
> political compromise that necessarily attends the legislative process in a
> healthy, robust democracy," but also the fact that "many of the issues facing
> the General Assembly today are far more complex than those coming before
> it in earlier times and that the legislation needed to address the problems
> underlying those issues often must be multifaceted."

12

*Id*. at 369 (quoting *Md. Classified Emps. Ass'n, Inc. v. State*, 346 Md. 1, 14 (1997)).

In order to determine whether HB 135 violated the one subject clause, the Court of Appeals looked to the then somewhat recent cases which also concerned the one subject clause: *Porten Sullivan*, 318 Md. 387 (1990); *State v. Prince Georgians*, 329 Md. 68 (1993); *Md. Classified Emps. Ass'n, Inc.*, 346 Md. 1 (1997); and *Migdal v. State*, 358 Md. 308 (2000).

In *Porten Sullivan*, the legislation in question began as a House measure "designed to extend the life of a Prince George's County energy tax . . . [and to similarly extend the life] for a special transfer tax in Prince George's County." 318 Md. at 389. While in the Senate, however, the legislation was amended to include "extensive ethical regulations pertaining to the Prince George's County Council." *Id.* These ethical regulations required County Council members to publicly disclose receipt of "money, goods, or services from an applicant," and precluded them from voting or participating in that applicant's application. *Id.* at 390-91. When the bill was challenged for violating the one subject requirement, the State argued that the "subject here is the management of public affairs in Prince George's County." *Id.* at 396. The Court of Appeals summarily rejected that argument and determined that the bill violated the one subject requirement, stating that "[t]he 'ethics' provisions are unrelated to raising revenue for county government operations." *Id.* at 404. Although the *Porten Sullivan* Court acknowledged "the difficulty of defining with precision when a measure contains 'distinct and incongruous subjects,'" it recognized that a statute's constitutionality may be upheld if the act's subjects are

13

"germane" to one another, meaning that they have a "connection and interdependence." *Id*. at 406-07. Nevertheless, the Court found that the ethics and tax provisions constituted "two distinct and incongruous subjects," rendering the act unconstitutional. *Id*. at 409.

Following the Court of Appeals's decision in *Porten Sullivan*, the General Assembly again unsuccessfully attempted to attach the Prince George's County Council ethics provisions to a clearly unrelated bill. In *Prince Georgians*, the House introduced House Bill 937, which was meant to address "certain planning and zoning matters in Montgomery County." 329 Md. at 71. After passing in the House, the Senate "amended H.B. 937 to include the proposed ethics and election standards contained in" the bill that failed in *Porten Sullivan*. *Prince Georgians*, 329 Md. at 71. Observing that *Porten Sullivan* "is dispositive," the Court of Appeals had no trouble concluding that the bill violated the one subject requirement because "the Montgomery County planning and zoning provisions and the Prince George's County ethics and election standards" are "distinct and incongruous." *Id*. at 75.

Unlike *Porten Sullivan* and *Prince Georgians*, the Court of Appeals held in *Md. Classified Emps. Ass'n* that the law in question complied with the one subject requirement. There, the General Assembly sought to enact legislation in order to address growing demands for "welfare reform." *Md. Classified Emps. Ass'n,* 346 Md. at 3-4. To do so, the Senate proposed SB 754, a bill which would establish a pilot program of "welfare reform" in Baltimore City, Anne Arundel County, and Prince George's County. *Id*. at 5. Pursuant to this pilot program, the Department of Human Resources would require recipients of Aid to Families with Dependent Children ("AFDC") to sign agreements "imposing certain

14

mutual obligations" such as cooperating with child support enforcement and participating in job search and life skills activities. *Id*. at 5-6. SB 754 underwent several amendments, both with the Senate Finance Committee, as well as on the Senate floor. *Id*. at 7. One notable amendment, not tied to the pilot program, was a provision which required the Department of Human Resources to notify the Motor Vehicle Administration "of persons who were obligated to pay child support to AFDC recipients and who were more than 60 days in arrears in their child support" so that, following an opportunity for a hearing, that person's driver's license could be suspended. *Id*.

Whereas SB 754 sought to achieve welfare reform, the House introduced HB 1177, a bill that "created a child support enforcement 'privatization' pilot program" that required the Department of Human Resources to completely privatize child support enforcement in Baltimore City and two other counties. *Id*. HB 1177 was met with substantial opposition, in part because of the dramatic impact it would have on State employees affected by the privatization aspect of the bill. *Id*. at 9. Notably, one amendment to HB 1177 included a provision that "followed precisely the floor amendment made to Senate Bill 754" requiring the suspension of the driver's license of a person in default of child support obligations to an AFDC recipient. *Id*. With its last amendment, HB 1177 "dealt with more than just a pilot program of 'privatizing' child support enforcement." *Id*.

Although HB 1177 was ultimately defeated in the Senate, its provisions regarding the privatization of child support enforcement and the suspension of drivers' licenses survived when they were engrafted onto SB 754. *Id*. at 11. On the evening of the last day of the legislative session, the House approved the Senate amendments, adopted additional

15

floor amendments, and passed the bill by a 120-19 vote. *Id*. at 12. The Senate then concurred in the House amendments and passed SB 754 by a 46-1 vote. *Id*.

The Court of Appeals concluded that the law did not violate the one subject requirement of the Maryland Constitution. After noting the deferential approach to one subject challenges, the Court stated that

> Connection and interdependence can be on either a horizontal or vertical plane. Two matters can be regarded as a single subject . . . either because of a direct connection between them, horizontally, or because they each have a direct connection to a broader common subject to which the Act relates.

*Id*. at 15-16 (citing *Panitz v. Comptroller*, 247 Md. 501, 511-12 (1967)). The Court explained, "If several sections of the law refer to and are *germane* to the same subject-matter, which is described in its title, it is considered as embracing but a single subject, and as satisfying the requirements of the Constitution in this respect." *Id*. at 16 (quoting *Baltimore v. Reitz*, 50 Md. 574, 579 (1879)).

The Court first examined whether the creation of a privatized pilot program for child support collection was sufficiently connected to the provision calling for the suspension of drivers' licenses. *Id*. The Court concluded that these two provisions did not violate the one subject requirement, as the clear objective of the bill "was to increase child support collections," and both provisions sought to accomplish that goal. *Id*. at 17.

The Court proceeded to examine whether that objective—increased child support collections—had "a sufficient nexus with the balance of Senate Bill 754 to constitute part of the 'single subject' of 'welfare reform.'" *Id*. The Court readily concluded that there existed "a sufficient nexus" to satisfy the one subject requirement. *Id*. Specifically, the

16

Court stated that "The unmistakable objective . . . was to break the cycle of dependency on Government assistance." *Id*. Additionally, the Court noted that "The nexus between child support enforcement and weaning people off of AFDC has been well-established for many years." *Id*. at 18. The Court concluded that there was no Article III, § 29 violation as the legislative history

> demonstrate[d] not just a close connection, but a true interdependence, between effective child support enforcement and the goal of significantly reducing the number of people relying on AFDC. It is therefore clear beyond cavil that Senate Bill 754 *did* embrace but a single subject, of which the pilot program of "privatizing" child support enforcement in Baltimore City and Queen Anne's County was a legitimate part.

*Id*. at 20-21.

The final case contemplated by the *Delmarva Power & Light* Court was *Migdal*. In *Migdal*, a law was passed that did two things: first, in an effort to protect directors from shareholders' derivative suits, it stated that investment company directors are not "interested persons" for purposes of the Federal Investment Company Act of 1940; second, the law required any entity seeking to establish a resident agent to first obtain the resident agent's written consent. 358 Md. 310-11. Notably, the provision concerning immunity for investment company directors originated as its own separate bill: House Bill 356. *Id*. at 311. HB 356 passed by a vote of 83 to 36 in the House, but died in the Senate when the Senate Judicial Proceedings Committee voted 8 to 3 against the bill. *Id.* When HB 356 died in the Senate, several mutual fund firms (which had requested the bill in the first place) threatened to leave Maryland and reincorporate in Delaware. *Id*.

The day after the mutual fund firms made their intentions known, the House

17

engrafted the provisions contained in its failed HB 356 onto Senate Bill 468, a bill which exclusively concerned resident agents, and which had passed in the Senate by a vote of 44 to 0. *Id*. The amended version of SB 468 passed in the Senate by a vote of 26 to 20, but notably, "[t]he original sponsor of Senate Bill 468 spoke and voted against the Bill on the Senate Floor." *Id*. at 312. On appeal, the Court of Appeals readily concluded that SB 468 violated the one subject requirement as there was no connection between the investment directors' immunity from liability and the requirement to obtain written consent from resident agents. *Id*. at 322-23.

With this legal landscape in mind, the *Delmarva Power & Light* Court had no difficulty concluding that the law in question there violated the one subject clause. *Id*. The Court held that "[t]here is no connection whatever" between the provision creating a fund to sustain PSC and OPC operations and the provision that retroactively excused the PSC from following the mandates of the Administrative Procedure Act. *Id*. at 375. Specifically, the Court noted that there was "clearly no direct, horizontal connection or interdependence between them." *Id*. at 375-76. The Court further rejected the argument that the two subjects were vertically "germane" to the "efficient operation" or "the effective funding" of the PSC and OPC, noting that "there is nothing whatever in this record to suggest that the Legislature viewed those provisions as having that connection, and, even more important, nowhere is that broader subject reflected in the title to the Act." *Id*. at 376.

In addition to the fact that the two provisions were clearly unrelated, the *Delmarva Power & Light* Court also noted the unusual manner in which the bill was enacted. *Id*. at 376. HB 135 passed in the late-night hours on the last night of the legislative session, and

18

"When asked to approve the Conference Committee Report, the members [of both Chambers] were told only that the bill related to the non-lapsing fund and, as to that subject, had been conformed to the Senate version." *Id*. at 377-77. "Nothing was said," however, about the fact that the bill would also contain a new provision specifically targeting and undermining a recently published Court of Appeals decision concerning PSC regulations complying with the Administrative Procedure Act. *Id*. at 377. Rather, that component was "stealthily incorporated into" the bill. *Id*. (quoting *Davis*, 7 Md. at 160). Thus, the content of the bill itself, coupled with the surreptitious manner in which it was enacted, persuaded the Court that HB 135 violated the one subject requirement of Article III, § 29 of the Maryland Constitution. *Id*

Returning to the instant case, the Licensees argue that Chapter 389, as enacted, effectively does two separate things in violation of Art. III, § 29 of the Maryland Constitution. First, it allows for the possible creation of more Class B-D-7 liquor licenses in a certain area of the 45th legislative district through an exchange program. Second, it restricts the hours of operation for certain liquor licenses within a separate area of the 45th legislative district.

Applying the accepted deferential approach to one subject challenges, which seeks "not to interfere with or impede legislative action," *id.* at 368-69, we conclude that these two provisions share the requisite "connection and interdependence" to survive a one subject challenge, *Porten Sullivan*, 318 Md. at 407. Specifically, both provisions regulate the sale and distribution of alcohol in the 45th legislative district. In this respect, both provisions, although they accomplish two separate things, clearly "refer to and are *germane*

19

to the same subject matter"—the overall regulation of alcohol in Baltimore City. *Migdal*, 358 Md. at 317. Indeed, such a construction of Chapter 389 is consistent with our jurisprudence that

> the General Assembly has chosen to closely control by statute even the more detailed aspects of the alcoholic beverages industry. This close regulation is perhaps partly due to the fact that, unlike other regulated areas, there is not a single agency that administers the alcoholic beverages law, but rather numerous local boards that are charged with its enforcement.

*Bd. of Liquor License Comm'rs for Balt. City v. Hollywood Prods., Inc.*, 344 Md. 2, 13 (1996). By enacting Chapter 389, the General Assembly acted within its recognized authority to "closely control" the regulation of alcohol in the 45th legislative district. *Id*.

In their brief, the Licensees argue that Chapter 389 is as offensive to the one subject clause as the bill at issue in *Migdal*. As noted above, *Migdal* involved a bill that not only required a resident agent's written consent prior to appointment, but also excused directors of certain investment companies from liability. 358 Md. at 310-11. There, the Court of Appeals held that requiring the written consent of resident agents was not "germane" to investment director liability. *Id*. at 322. We fail to see how *Migdal* bolsters the Licensees' one subject argument.

Instead, although it is difficult to compare and contrast caselaw in this arena, *Md. Classified Emps. Ass'n* supports our view that Chapter 389 does not violate the one subject provision. There, the Court found that two provisions—one privatizing child support enforcement, and the other developing a pilot program for welfare reform that imposed affirmative obligations on recipients—served the ultimate objective of reducing dependence on government assistance. 346 Md. at 20-21. The two provisions at issue here

20

allowing for an exchange of Class B licenses and a restriction of hours for Class B-D-7 licenses within the 45th legislative district appear to be even more "related" than the provisions that withstood scrutiny in *Md. Classified Emps. Ass'n*. Accordingly, we conclude that Chapter 389 embraces but one subject: the regulation of liquor licenses within Baltimore City's 45th legislative district.

The way Chapter 389 was enacted further bolsters our conclusion that there is no one subject violation here. Chapter 389 was the product of two separate bills: SB 571 and HB 954. Although SB 571 stalled in the House, the legislative history materials reveal that, not only did the bill face no opposition at the hearing before the Senate's Education, Health, and Environmental Affairs Committee, but the Baltimore City State Senate Delegation unanimously supported it, and it passed unanimously in the Senate. Similarly, HB 954, although it did not initially contain language restricting hours for certain liquor licenses, also passed unanimously in both the House and the Senate both before and after Senator McCray's floor amendment.[6] Whereas in *Migdal* and *Delmarva Power & Light* members of the General Assembly acted surreptitiously to pass legislation, here, there is no evidence to suggest that the General Assembly acted improperly in order to enact Chapter 389. *Delmarva Power & Light*, 371 Md. at 377. We therefore conclude that

---

[6] We note that HB 954 faced some opposition at the hearing before the House Economic Matters Committee. Specifically, the Mount Vernon Belvedere Association opposed HB 954. Nevertheless, as noted above, not a single Senator or Delegate ever voted in opposition to the passage of HB 954 at any point in time in its entire legislative history— including after Senator McCray's floor amendment adding the language from SB 571.

Chapter 389, as enacted, does not violate the one subject requirement of Article III, § 29 of the Maryland Constitution.

## II. THE EQUAL PROTECTION CLAIM

We next turn to the second issue presented: whether the Licensees produced sufficient evidence to support their claim that Chapter 389 violates equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland State Constitution.

As noted above, "Under settled Maryland law, appellate review of administrative decisions is limited to those issues and concerns raised before the administrative agency." *Cap. Com. Props., Inc*., 158 Md. App. at 96. This principle is important because our review of the record shows that the only evidence the Licensees provided in support of their equal protection claim were prior versions of the relevant law, and Census data showing the demographic makeup of Baltimore City. The Licensees also asked the Board to take "official notice" of the legislative history of Chapter 389. In all four cases, the Board declined to rule on the Licensees' equal protection argument, finding that the Licensees failed to provide sufficient evidence to support their claims. Thus, although the Licensees and the Board expended significant energy in their appellate briefs arguing whether Chapter 389 substantively violates equal protection, under the well-settled standard of review in administrative appeals, we will focus our inquiry on the Board's determination that the Licensees failed to produce sufficient evidence to support their argument that Chapter 389 cannot withstand constitutional "strict scrutiny" review. We agree with the Board that the Licensees failed to meet their threshold burden.

22

In order to explain why the Licensees failed to produce sufficient evidence, it behooves us to first establish the legal landscape for challenging a law pursuant to the Equal Protection Clause. We initially note that Article 24 of the Maryland Declaration of Rights does not specifically mention "equal protection." Instead, it provides "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Decl. of Rts. Art. 24.

> Although the Maryland Constitution contains no express equal protection clause, it is settled that the Due Process Clause of the Maryland Constitution, contained in Article 24 of the Declaration of Rights, embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment.

*Murphy v. Edmonds*, 325 Md. 342, 353-43 (1992) (citing *Hargrove v. Bd. of Trs.*, 310 Md. 406, 416 (1987)). Thus, we look to the Fourteenth Amendment to the United States Constitution, which provides, in relevant part, that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

> While the Equal Protection Clause of the Fourteenth Amendment and the equal protection guarantee embodied in Article 24 of the Maryland Declaration of Rights are obviously independent and capable of divergent application, we have consistently taken the position that the Maryland equal protection principle applies "in like manner and to the same extent as" the Equal Protection Clause of the Fourteenth Amendment.

*Id*. at 354 (some internal quotation marks omitted) (quoting *Attorney General of Md. v. Waldron*, 289 Md. 683, 704-05 (1981)). Accordingly, when analyzing an equal protection claim, we may construe United States Supreme Court opinions as "practically direct

authorities" concerning Article 24 of the Maryland Declaration of Rights. *Id*. (quoting

*Waldron*, 289 Md. at 705).

The Court of Appeals has explained that there are four distinct lenses for challenging

a law pursuant to the Equal Protection Clause: rational basis, heightened rational basis,

intermediate scrutiny, and strict scrutiny. *Pizza di Joey, LLC v. Mayor and City Council

of Balt*., 470 Md. 308, 346-48 (2020). Consistently throughout these proceedings, the

Licensees have argued that "strict scrutiny" is the only appropriate lens for their equal

protection claim.[7] The "strict scrutiny" lens of review is applicable "[w]hen a statute

creates a distinction based upon 'clearly suspect' criteria (such as race, gender, religion, or

national origin), or when it infringes on a "fundamental" right[.]" *Id*. at 346 (citing *Powell

v. Md. Dep't of Health*, 455 Md. 520, 548 (2017)). Appellate courts "will invalidate a

statute that is subject to strict scrutiny unless it 'is necessary to promote a compelling

governmental interest.'" *Id*. (quoting *Conaway v. Deane*, 401 Md. 219, 272-73 (2007)).

Where the strict scrutiny lens is appropriately applied, challenged laws "rarely survive the

legal glare." *Id*. at 346-47 (quoting *Conaway*, 401 Md. at 273).[8]

---

[7] Our review of the record unequivocally shows that at no point did the Licensees request rational basis, heightened rational basis, or intermediate scrutiny review.

[8] Under the rational basis test, the challenged statute is presumed constitutional, and will be upheld as such "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [we] can only conclude that the [State's] actions were irrational." *Pizza di Joey*, 470 Md. at 347 (quoting *Murphy*, 325 Md. at 355). Heightened rational basis is appropriate when "an economic regulation . . . prohibits an individual from practicing his or her chosen trade" or when the law "on its face, discriminates based on a factor that is unrelated to the stated purpose of the regulation[.]" *Id*. at 348 (citing *Waldron*, 289 Md. at 728). Finally, intermediate

24

The Licensees have consistently argued before the Board, the circuit court, and this Court, that strict scrutiny is the only appropriate lens to review Chapter 389 because, in their words, "in the instant case, race – a suspect class – is implicated." The Licensees concede that Chapter 389 is facially neutral—the law itself does not specifically mention or target a suspect class. Nevertheless, they contend that, because the 45th legislative district is an almost exclusively African American community, restricting the operating hours of liquor license establishments in an area within that district unfairly targets a suspect class and warrants strict scrutiny review.

To support their claim before the Board that Chapter 389 created a distinction based upon race, the Licensees cited to United States Census Bureau data which showed that the neighborhoods affected by the restriction on hours of operation provision in Chapter 389 are all approximately 90% African American, but that contiguous nearby neighborhoods unaffected by Chapter 389 are closer to only 5% African American.

In their memorandum to the Board, the Licensees stated

A committee hearing on Senate Bill 571, a video of which is on the General [A]ssembly website, reveals that the driving force behind this legislation was the Baltimore City Police Department. In a classic example of racial profiling, the Police Department is very comfortable with the argument that a super majority black neighborhood happens to be a high crime area. Therefore, it is safe to say that black people are more likely to cause crime. As a result, black people in these neighborhoods should not have the freedom and discretion to socialize together after 10 p.m. since they are more likely

---

scrutiny is appropriate "when a statute makes a distinction based on a 'quasi-suspect' classification, such as illegitimacy[.]" *Id*. at 347 (citing *Conaway*, 401 Md. at 275-76). To survive intermediate scrutiny, the law must "serve important governmental objectives and must be substantially related to the achievement of those objectives." *Id*. (quoting *Conaway*, 401 Md. at 276).

than white people to cause crime, especially when consuming alcohol since black people do not have the intelligence and maturity to drink responsibly.

Despite this strongly-worded claim that the law was enacted for a racially discriminatory purpose, the only supporting evidence the Licensees relied upon was the legislative history materials related to Chapter 389, and United States Census data concerning the racial makeup of different community regions in Baltimore City. As noted above, the Board rejected the Licensees' equal protection argument, finding that the Licensees failed to present sufficient evidence to support their claim that Chapter 389 was unconstitutional.

Under settled Supreme Court precedent, "A facially neutral law . . . warrants strict scrutiny only if it can be proved that the law was 'motivated by a racial purpose or object, or if it is 'unexplainable on grounds other than race[.]'" *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (internal citations omitted) (first quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995), then quoting *Shaw v. Reno*, 509 U.S. 630, 644 (1993)). Moreover, evidence of a racially disproportionate impact, standing alone, is insufficient to prove a violation of the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another."); *cf. Jefferson v. Hackney*, 406 U.S. 535, 548 (1972) (implicitly recognizing that a "naked statistical argument" is insufficient to prevail on an equal protection claim). Rather, "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of*

26

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). A challenger must make a prima facie showing of discriminatory intent before "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Washington*, 426 U.S. at 241 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632 (1972)).

In *Washington*, the Supreme Court was tasked with reviewing whether facially neutral government action—"a qualifying test administered to applicants for positions as police officers in the District of Columbia Metropolitan Police Department"—violated the Equal Protection Clause. *Id*. at 232. There, in order to be accepted by the police department, an applicant "was required to satisfy certain physical and character standards, to be a high school graduate or its equivalent, and to receive a grade of at least 40 out of 80 on Test 21, which [was] an examination that [was] used generally throughout the federal service." *Id*. at 234 (internal quotation marks omitted). Test 21 "was developed by the Civil Service Commission, not the Police Department, and . . . was designed to test verbal ability, vocabulary, reading and comprehension." *Id*. at 234-35 (internal quotation marks omitted).

Test 21 was challenged on equal protection grounds, with the challengers arguing that "Test 21 bore no relationship to job performance and has a highly discriminatory impact in screening out black candidates." *Id*. at 235 (internal quotation marks omitted). The district court noted that the evidence presented by the challengers "warranted three conclusions: '(a) The number of black police officers, while substantial, is not proportionate to the population mix of the city. (b) A higher percentage of blacks fail the

27

Test than whites. (c) The Test has not been validated to establish its reliability for measuring subsequent job performance.'" *Id*. at 235. The district court nevertheless rejected the constitutional challenge, finding that "[t]he proof is wholly lacking that a police officer qualifies on the color of his skin rather than ability." *Id*. at 236.

The Court of Appeals for the District of Columbia Circuit, however, reversed the district court, finding that a "lack of discriminatory intent in designing and administering Test 21 was irrelevant; the critical fact was . . . that a far greater proportion of blacks . . . failed the test than did whites." *Id*. at 237. That court held that the "disproportionate impact, standing alone without regard to whether it indicated a discriminatory purpose, was . . . sufficient to establish a constitutional violation[.]" *Id*.

On certiorari review, the Supreme Court rejected the rationale of the Court of Appeals, stating, "our cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Id*. 239. Regarding laws which appear to be facially neutral, the Supreme Court noted,

> This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of race.

*Id*. at 241 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). For purposes of proving racially discriminatory intent, the Supreme Court stated that "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Id*. at 242.

28

The Supreme Court made clear, however, that a disproportionate impact, standing alone, will not suffice to establish an equal protection violation:

> Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but *it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule, that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations*.

*Id*. (emphasis added) (citation omitted) (citing *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964)). Thus, *Washington* held that it is inappropriate to apply the strict scrutiny lens of constitutional review where the only evidence of discrimination is a disparate impact, and where there is no evidence of discriminatory purpose. *Id*.

The following year, the Supreme Court further elucidated its holding in *Washington*—that evidence of a racially discriminatory intent is necessary to obtain strict scrutiny review for an Equal Protection Clause challenge. In *Village of Arlington Heights*, a housing developer applied with the Village of Arlington Heights (the "Village") to rezone a 15-acre parcel from a single-family classification to a multiple-family classification. 429 U.S. at 254. The goal of the application was to introduce low and moderate-income housing into the area, "housing that would probably be racially integrated." *Id*. at 257-58. Notably, according to Census data during that time period, "only 27 of the Village's 64,000 residents were black." *Id*. at 255. When the Village denied the application, the developer, three African American individuals, a Mexican American individual, and a non-profit corporation all filed suit against the Village, alleging that the denial was racially motivated

in violation of the Equal Protection Clause. *Id*. at 254, 258-59. The district court rejected the constitutional challenge, finding that "the [Village was] not motivated by racial discrimination or intent to discriminate against low-income groups when they denied rezoning, but rather by a desire 'to protect property values and the integrity of the Village's zoning plan.'" *Id*. at 259.

The Seventh Circuit Court of Appeals reversed. *Id*. Notably, that court accepted the district court's finding that the Village was "motivated by a concern for the integrity of the zoning plan, rather than by racial discrimination." *Id*. Nevertheless, the Court of Appeals stated that "the refusal would have a disproportionate impact on blacks[,]" who, based on family income, "constituted 40% of those Chicago area residents who were eligible to become tenants" of the proposed development. *Id*. Recognizing that "such a disparity in racial impact alone does not call for strict scrutiny," the Court of Appeals proceeded to note that "the denial of rezoning must be examined in light of its 'historical context and ultimate effect.'" *Id*. at 259-60. Noting "a high degree of residential segregation" in the region, the Court of Appeals concluded that "Arlington Heights could not simply ignore this problem. Indeed, it found that the Village had been 'exploiting' the situation by allowing itself to become a nearly all white community." *Id*. at 260. Accordingly, the Court of Appeals "ruled that the denial of the [application] had racially discriminatory effects and could be tolerated only if it served compelling interests." *Id*.

Finding that the desire to protect property values failed to meet this strict scrutiny standard,[9] the court determined that the denial constituted a violation of the Equal Protection Clause. *Id*.

The Supreme Court reversed the Court of Appeals. Relying on *Washington*, the Court noted that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is *required* to show a violation of the Equal Protection Clause." *Id*. at 264-65 (emphasis added). The Court stressed the importance of the evidence presented in such a constitutional claim, stating,

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one race than another," [*Washington*, 426 U.S. at 242] may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . The evidentiary inquiry is relatively easy. But such cases are rare. Absent a pattern as stark as that in [*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (holding that statute violated the Fifteenth Amendment where it moved voting boundary to the detriment of all but four or five African American voters, but did not remove a single white voter from the boundary)] or [*Yick Wo*, 118 U.S. 356 (finding Equal Protection violation where local board denied permits to nearly all Chinese applicants, but granted nearly every application to non-Chinese applicants)], *impact alone is not determinative, and the Court must look to other evidence*.

*Id*. at 266 (emphasis added) (internal citations and footnotes omitted).

---

[9] As noted above, the requirement that the government action promote a "compelling interest" only applies to the strict scrutiny lens of constitutional review. *Pizza di Joey*, 470 Md. at 346 (quoting *Conaway*, 401 Md. at 272-73)).

Turning to the evidence presented, the Supreme Court noted that "there is little about the sequence of events leading up to the decision that would spark suspicion." *Id*. at 269. The evidence showed that the Village adopted its zoning policy long before the developer applied for rezoning, and the Village also "applied the policy too consistently for [the Court] to infer discriminatory purpose from its application in this case." *Id*. at 270. The Court noted that "[t]he statements by the Plan Commission and the Village Board members . . . focused almost exclusively on the zoning aspects" of the rezoning petition. *Id*. Accordingly, the Supreme Court concluded that "the evidence does not warrant overturning the concurrent findings of both courts below. Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision. This conclusion ends the constitutional inquiry." *Id*. at 270-71 (footnote omitted).[10]

The takeaway from *Washington* and *Village of Arlington Heights* is clear: in the context of facially neutral government action, challengers seeking strict scrutiny review for their equal protection claims bear the burden of showing that discriminatory purpose was a motivating factor in the government's decision or other action. *Village of Arlington Heights*, 429 U.S. at 270-71; *Washington*, 426 U.S. at 242.

---

[10] In a footnote, the Supreme Court noted that, even had the challengers presented sufficient evidence to show that the Village's decision was motivated by a racially discriminatory purpose, such a showing would not have ended the constitutional inquiry. *Village of Arlington Heights*, 429 U.S. at 270 n.21. Rather, such an evidentiary showing would have merely shifted the burden to the Village to defend its decision pursuant to strict scrutiny review. *Id*.

A case that demonstrates satisfaction of the challengers' evidentiary burden is *Griffin v. Cnty. School Bd. of Prince Edward Cnty.*, 377 U.S. 218 (1964). There, in response to the landmark decision *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954), which held that the racial segregation of public schools violated the Equal Protection Clause, Prince Edward County responded by enacting legislation to close any public schools that enrolled both white and African American children. *Griffin*, 377 U.S. at 221. The evidence showed that, as early as 1956 (two years after *Brown*), the Supervisors of Prince Edward County resolved not to operate desegregated public schools, and accordingly, they closed all public schools in the county while forming private groups to fund segregated private schools. *Id.* at 222-23.

In holding that the enactments violated the Equal Protection Clause, the Supreme Court noted that, "showing that different persons are treated differently is not enough, without more, to show a denial of equal protection." *Id.* at 230 (citing *Kotch v. Bd. of River Port Pilot Comm'rs*, 330 U.S. 552, 556 (1947)). Nevertheless, the Supreme Court stated:

> *But the record in the present case could not be clearer* that Prince Edward's public schools were closed and private schools operated in their place with state and county assistance, for one reason, and one reason only: to ensure, through measures taken by the county and the State, that white and [African American] children in Prince Edward County would not, under any circumstances, go to the same school. Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and the grounds of race and opposition to desegregation do not qualify as constitutional.

*Id.* at 231 (emphasis added). The Supreme Court held that, based on the record presented, Prince Edward County's legislation to close all public schools, although facially neutral, violated the Equal Protection Clause. *Id.* at 232.

33

The Supreme Court reached the same conclusion—that a facially neutral law violated the Equal Protection Clause—in *Hunter v. Underwood*, 471 U.S. 222 (1985). There, Article VIII, § 182 of the Alabama Constitution provided for the disenfranchisement of any person convicted of a crime "involving moral turpitude." *Id*. at 223. This provision was challenged on the ground that it was adopted in order to disenfranchise African Americans in violation of the Equal Protection Clause. *Id*. at 224. Although § 182 was racially neutral on its face, the challengers produced evidence that the provision had caused racially disproportionate effects. *Id*. at 227.

In reviewing the constitutionality of the provision, the Supreme Court accepted that § 182 produced racially disproportionate effects, but noted that this alone did not resolve whether there was an equal protection violation. *Id*. at 227-28 (citing *Washington*, 426 U.S. at 239). Instead, the Court turned to the evidence concerning the initial motivation for enacting the provision. The Supreme Court noted the inherent difficulties in determining whether legislators who enact legislation secretly possess racially discriminatory intent:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

34

*Id.* at 228 (quoting *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968)).  Despite these difficulties associated with determining discriminatory intent, the Court found there was ample evidence in the record to conclude that § 182 was enacted with a racially discriminatory purpose, shifting the burden to the government to justify the provision.

The Supreme Court noted that, although there were no "eyewitnesses" to the proceedings when § 182 was adopted in 1901, "testimony and opinions of historians were offered and received without objection.  These showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstructionist South to disenfranchise blacks."  *Id.* at 228-29 (citing S. Hackney, *Populism to Progressivism in Alabama* 147 (1969)).  The evidence showed that

> The delegates to the all-white convention were not secretive about their purpose.  John B. Knox, president of the convention, stated in his opening address:
>
>> "And what is it that we want to do?  Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State."

*Id.* at 229.  The Court concluded that the evidence "demonstrated conclusively" that the legislators who enacted § 182 did so for a racially discriminatory purpose.  Accordingly, there was sufficient evidence in the record to show discriminatory intent, and that the provision violated the Equal Protection Clause.  *Id.* at 229, 233.

We return to the instant case.  The Licensees concede that Chapter 389 is not racially discriminatory on its face.  Thus, under settled Supreme Court precedent, the Licensees had the burden of showing that the General Assembly's enactment of Chapter 389 was at

35

least partially motivated by discriminatory purpose in order to obtain strict scrutiny review. *Hunt*, 526 U.S. at 546.

The Licensees failed to meet their burden. Their reliance on the legislative history materials concerning Chapter 389, as well as the Census data showing the racial distribution of different neighborhoods in Baltimore City simply show, at most, a racially disparate impact. That evidence does not, however, demonstrate the discriminatory intent or purpose necessary to support strict scrutiny review for equal protection purposes. *Village of Arlington Heights*, 429 U.S. at 270-71. In fact, our thorough review of the record in this case, including all of the legislative history materials available from the General Assembly, reveals that the sponsors and supporters of Chapter 389 were solely focused on curtailing crime in the region—not on discriminating against a suspect class.

At the hearing before the Senate Education, Health and Environmental Affairs Committee, Senator McCray explained that he was sponsoring SB 571 in an effort to curb "high violence" crimes in the 45th legislative district. He testified that the idea to introduce the bill came from conversations with Major Lloyd Wells of the Baltimore City Police Department as well as other local leaders who wanted to address the violent crime plaguing their community. Michelle Wirzberger, Director of Government Affairs for the Baltimore City Police Department, referenced written materials concerning crime statistics and voiced the Department's support for the bill. These written materials purport to show a connection between violent crime and geographic proximity to liquor establishments within the bounded area of the 45th legislative district. Major Wells also testified in support of the bill and explained that the goal of reducing the operating hours was to curb

36

violent crime. Additionally, Jack Lopez, a resident of the impacted area and a board member of the Oliver Community Association, explained that the community was frustrated with the violence and crime associated with local liquor establishments, and that a reduction in hours would limit the exposure of the community to such crimes. Finally, Harold Bennett of the Broadway East Community Association explained that he supported the bill because he believed that liquor establishments were abusing their licenses to encourage off-site consumption when the licenses themselves were intended for on-site consumption.

The record evidence unequivocally shows that the sole purpose in enacting Chapter 389's restriction on hours was to curtail crime within the bounded area of the 45th legislative district. In short, we see no evidence of a discriminatory intent.[11] Indeed, when asked at oral argument what evidence existed in the record to show discriminatory intent, the Licensees' counsel candidly conceded, "I don't have any[.]" In the parlance of *Village of Arlington Heights*, the Licensees' failure to satisfy their burden that discriminatory purpose was a motivating factor in the passage of Chapter 389 "ends the constitutional inquiry." 429 U.S. at 271.

---

[11] Moreover, we note that Chapter 389's operating hours restriction only targets a defined portion of the predominantly African American 45th legislative district—it otherwise leaves untouched the remaining portion of that district. If the legislation were truly designed to target African Americans, one would expect Chapter 389 to restrict the operating hours for liquor licenses in *all* of the predominantly African American neighborhoods located in the 45th legislative district. Chapter 389, however, does no such thing.

In conclusion, because the Licensees failed to carry their burden of proving that discriminatory purpose was a motivating factor in the enactment of Chapter 389, their equal protection challenge to the law must fail.[12]  Accordingly, we affirm the Board's decision in all four cases.[13]

> **JUDGMENTS IN CASE NOS. 24-C-20-003794 AND 24-C-20-003795 AFFIRMED; JUDGMENTS IN CASE NOS. 24-C-20-004827 AND 24-C-20-004828 REVERSED WITH INSTRUCTIONS TO THE CIRCUIT COURT TO AFFIRM THE BOARD'S DECISION. COSTS TO BE PAID BY LICENSEES.**

---

[12] We note that in the two cases where the circuit court reversed the Board, the trial judge found that Chapter 389 was subject to strict scrutiny, but that the Board "erroneously applied the *rational basis* test."  We see nothing in the record to indicate that the Board applied any lens of constitutional review whatsoever.  Rather, as explained above, the Board correctly declined to rule on the Licensees' equal protection claim because they failed to present sufficient evidence. Nothing in this opinion should be construed as holding that any particular lens of constitutional review would be appropriate here.  We reiterate that we merely hold that the Licensees failed to produce sufficient evidence to support their claim that Chapter 389 cannot survive strict scrutiny under the Equal Protection Clause.

[13] We note that the Licensees do not purport to be members of the suspect class disproportionately affected by Chapter 389's restriction.  Nevertheless, the Board does not dispute that the Licensees have standing to challenge the constitutionality of Chapter 389. We agree that the Licensees have standing. *See Craig v. Boren*, 429 U.S. 190, 194 (1976) (noting that a party incurring "a direct economic injury through the constriction of her buyer's market" has standing to challenge the constitutionality of a law).